# Exhibit A

Page 1

1             IN THE UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF PENNSYLVANIA
2                          -   -   -
3

COLLEEN KOSLOSKY                    :

4

        vs.                         :

5                                        Civil action no.
AMERICAN AIRLINES, INC.      :   2:18-cv-04654-PD

6

7

8                          VOLUME I
9                          -   -   -
                 Philadelphia, Pennsylvania
10                    May 7, 2019
                           -   -   -
11

12                 Deposition of COLLEEN KOSLOSKY, held in
13   the offices of VERITEXT LEGAL SOLUTIONS, 1801 Market
14   Street, Suite 1800, on the above date at 10:12 a.m.,
15   before Rachel L. Cicalese, a Registered Professional
16   Reporter and Certified Court Reporter.
17
                           -   -   -
18

19

20

21

22

              VERITEXT LEGAL SOLUTIONS
23              MID-ATLANTIC REGION
          1801 Market Street - Suite 1800
24        Philadelphia, Pennsylvania  19103

```
                                              Page 2
 1   APPEARANCES:
 2                KOLLER LAW, LLC
                  BY:  DAVID M. KOLLER, ESQUIRE
 3                2043 Locust Street, Suite 1B
                  Philadelphia, PA  19103
 4                215-545-8917
                  Davidk@kollerlawfirm.com
 5                Attorneys for Plaintiff
 6                FISHER & PHILLIPS, LLP
                  BY:  DANIEL E. FARRINGTON, ESQUIRE
 7                7501 Wisconsin Avenue, Suite 1220W
                  Bethesda, MD  20814
 8                301-951-1538
                  Dfarrington@fisherphillips.com
 9                Attorneys for Defendant
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Colleen Koslosky

Page 21

1    but I was already displaced to Philadelphia.  I am

2    exhausted just hearing this.  And I got to Philly.

3    It was almost like I went full circle, and I came

4    home -- because I am from New Jersey.

5    Philadelphia -- Philadelphia, in the system they

6    have a horrible reputation, but at that time that

7    was the best-kept secret in the system.  That was

8    my favorite station.

9             Q.    And when you were displaced to

10   Philadelphia in 1992, did you continue as a

11   customer service agent?

12            A.    I did.  I did.

13            Q.    From the time you became a customer

14   service agent in 1990, through your last day of

15   employment, did you function as a customer service

16   agent?

17            A.    I did.

18            Q.    So, from 1990 through 2017?

19            A.    I did.

20            Q.    You were a customer service agent?

21            A.    The whole time.

22            Q.    Did you hold any other position with

23   the company over that time period?

24            A.    No.  Like --

Colleen Koslosky

Page 22

1          Q.     Like --

2          A.     No, I wasn't the chairman of the

3    board.  I wasn't a board member.  I was just a

4    lowly customer service agent.

5          Q.     That wasn't my implication.

6          A.     No.  I am being funny.  I am being

7    funny.  I am not taking that as any kind of insult.

8          Q.     Okay.  Well, let's -- then from 1992

9    through 2017, were you based in Philadelphia?

10         A.     I was.

11         Q.     That whole time?

12         A.     That whole time.

13         Q.     Were you subject to any furloughs?

14         A.     I was too senior at that time because

15   they changed everything to date of hire.

16         Q.     And you had previously mentioned that

17   unions came around in the nineties?

18         A.     They did come around in the nineties.

19   I think that happened after they took our pension

20   in '91 -- US Air did, US Air pension for the

21   customer service agents was eliminated.  I don't

22   even know what year it was, to tell you the truth.

23   I think it was maybe about '91 it was eliminated.

24         Q.     Okay.  Just so we are clear, US

Colleen Koslosky

Page 30

1              As far as managers, regular

2    managers -- are we going to be eliminating the duty

3    manager?  Are we going to be eliminating the duty

4    manager, because it didn't exist in 2017?

5         Q.    Right.  So, I am focusing on 2017.

6    You told me duty manager doesn't exist, and I am

7    asking you to whom the customer service managers

8    directly reported.

9         A.    Well, you had a senior manager.  So,

10   you had a manager who reported to the senior

11   managers.  Senior manager I assume would have

12   reported to Beth Norton.  I was never in any

13   meetings, but I do know that managers and senior

14   managers did get together for meetings.

15        Q.    All right.  So, in 2017, Beth Norton

16   was the --

17        A.    Customer service director.  Or I

18   think -- American has another name for it.

19        Q.    Managing Director of Customer Care?

20        A.    That is it.

21        Q.    Who were the senior managers who

22   reported to Beth Norton in 2017, if you know?

23        A.    Okay.  I will try to remember.  I do

24   want to preface this, if I may, though.  I do not

Colleen Koslosky

Page 31

1   get involved with the politics of the airport.  I

2   am not one -- I don't really pay attention to who

3   is where, what, and why.

4           Q.    I can only ask you what you know and

5   what you remember.

6           A.    Fair enough.

7           Q.    I should have said that when we were

8   talking about ground rules that if you don't

9   remember something or don't know something and that

10  is your most truthful answer, that is the answer

11  you should give.

12          A.    Fair enough.  I am just trying to

13  give you as full an answer as I can give you.

14          Q.    Thank you.  I will take full.  I will

15  take estimates.  I don't want guesses, though.

16          A.    Fair enough.  I am trying not to.

17  That is why I am being a tad long-winded, and I

18  don't mean to be.  Okay.

19                Could you please repeat the question?

20          Q.    Yes.  We are just laying out the

21  reporting structure in 2017.

22          A.    Okay.  Absolutely.  Sure.  Okay.

23          Q.    Here is where we are so far:

24  Customer service agents directly report to customer

Colleen Koslosky

Page 32

1    service supervisors, right?

2           A.    Right.

3           Q.    Customer service supervisors directly

4    report to customer service managers, right?

5           A.    Right.

6           Q.    Customer service managers directly

7    report to senior managers, right?

8           A.    They do.

9           Q.    Senior managers report to the

10   director, Beth Norton?

11          A.    To the director.

12          Q.    And I had asked you if you knew the

13   names of the senior managers?

14          A.    Okay.  I know one of the senior

15   managers at the time was Nicole Blanchard.  Another

16   one of the senior managers at the time was -- she

17   came over from American.  It's a really pretty

18   name, too.  It is not Charlene or -- I can't think

19   of her name.  I cannot think -- it is like a

20   Charlene -- Jillian.  Jillian.  It was a pretty

21   name.  I knew it was a really pretty name.

22   Jillian.

23               That is the only two I know of, to

24   tell you the truth.  That is it.

Colleen Koslosky

Page 34

1          A.     Right.

2          Q.     At the time of your separation, Beth

3    reported to Vice-President Olympia Colasante?

4          A.     Yes.

5          Q.     You are not sure who Beth reported to

6    before Olympia took that job?

7          A.     I never -- I don't get involved in

8    the politics.  I never had a reason.  I never had a

9    problem.  I don't know who the station manager was.

10   Honest to God, I had no idea.

11                And you know what, they come and go.

12   They do.  I don't have to tell you.  They come and

13   they go.  The next thing you know there is an

14   announcement coming out that there is a new

15   somebody out there.

16         Q.     I'm correct that you worked as a

17   customer service gate agent?

18         A.     Yes.

19         Q.     Correct?

20         A.     That is correct.  Yes, sir.

21         Q.     And for how long prior to your

22   separation did you work the gate agent function?

23         A.     I think there was -- well, from '92

24   all the way through, except there were a couple of

Colleen Koslosky

Page 36

1    because of a bid 15 to 20 years ago?

2           A.    I can.   Sure.   Every so often,

3    usually -- it depends.   It could be three times a

4    year, four times a year.   Depending upon the flow

5    of aircraft coming in, they have bids.   And what

6    bids are is they are schedules that are -- they are

7    schedules of staffing.   And they have -- some are

8    for ticket counter.   Some are for the gate.   Some

9    are for special services.   And based upon your

10   seniority and where you will fall, you bid your

11   line, your days off.   You can bid -- you can bid

12   the ticket counter.   You can bid special services.

13   You can bid international.   International.   You can

14   bid domestic.

15           And just depending upon what line is

16   open, the shift, the days off -- and again, where

17   your seniority lays -- that is how they do the bid.

18   And that's about the best explanation I have for

19   you.

20           Q.    Okay.   And, so, when it comes to the

21   different customer service agent functions --

22           A.    Yes.

23           Q.    -- at the Philadelphia Airport, the

24   particular function that a customer service agent

Colleen Koslosky

Page 37

```
 1   is going to work is going to be determined by how
 2   he or she bids and his or her relative seniority to
 3   the other people bidding for that function?
 4           A.    That is correct.
 5           Q.    And the functions are awarded in
 6   order of seniority?
 7           A.    That is correct.
 8           Q.    Right.  And is it the case that you
 9   were able to hold the function of your choosing for
10   so long because you were among the more senior
11   customer service agents?
12           A.    That is correct.
13           Q.    Do you know where you fell on the
14   list of --
15           A.    I was halfway up the page, of the
16   first page.  I don't know my number, but if I
17   looked at the page, I was right in the middle.
18   Maybe a little bit above it.
19           Q.    So, that might put you in the top ten
20   or 15?
21           A.    Top 15, maybe, is my best estimation.
22           Q.    So, your best estimation is that --
23           A.    Maybe 20.  I don't know.  It was
24   very -- it was right there.
```

Colleen Koslosky

Page 44

1          Q.    That is okay.  What about club reps?

2          A.    That is a different animal all

3     together.  That is run by Julie.  And club reps

4     are -- are club reps under --

5                You would know this.  Are they under

6     sales?  Is the club under the sales department.

7          Q.    Yes, I can't answer questions because

8     it is your deposition.  I am sorry.

9          A.    Okay.  I am sorry.  I just don't know

10    to tell you the truth.  But the club is a

11    completely separate entity as far as working at the

12    airport.  They have different rules, different

13    uniforms.  That is a different animal.  That is

14    just different.

15         Q.    All right.  So, it is your

16    understanding that the club rep position --

17         A.    Is not customer service.

18         Q.    Okay.  All right.  So, here is what I

19    have on my list as customer service agent

20    functions.

21         A.    Mm-hm.

22         Q.    Gate agent?

23         A.    Right.

24         Q.    Ticket counter agent?

Colleen Koslosky

Page 45

1          A.     Perfect.

2          Q.     Recheck?

3          A.     Yes.

4          Q.     POC?

5          A.     Right.

6          Q.     Special services?

7          A.     That is right.

8          Q.     What else?

9          A.     Baggage is out.  I don't know.  I

10    think that -- I think that pretty much wraps it up.

11          Q.     Okay.  Okay.  And were all of those

12    functions that fall under customer service those --

13    strike that.

14               All the agents who worked the

15    functions we just identified were all members of

16    the same customer service union, correct?

17          A.     Yes.

18          Q.     They were all on the same pay scale?

19          A.     All -- yes, as far as I know, they

20    were on the same pay scale.

21          Q.     All entitled to the same benefits?

22          A.     Everything, absolutely.

23          Q.     All right.  And if you were somewhere

24    around 15th most senior out of hundreds and

Colleen Koslosky

Page 46

1    hundreds of customer service agents, you had the

2    seniority to bid and hold any of the functions we

3    have discussed?

4          A.    Most likely.

5          Q.    I know that you said that you didn't

6    work anything other than the gates for the last

7    15 years or so years of your employment?

8          A.    Right.

9          Q.    Were you required to undergo any

10   periodic training in the other customer service

11   agent functions?

12         A.    Every so -- well, there were times

13   that they would -- I am using the word dump because

14   that is what they would say.  They would dump

15   training classes into -- I think it is called

16   I-Learning.  And then they would say, okay, that

17   one is really -- don't do that because that is not

18   part of this or they would dump ramp stuff that we

19   really didn't have to do.

20              But, yes, we would have to do

21   I-Learning for maybe other functions, but it wasn't

22   extensive.  It wasn't extensive like, you know,

23   going full on in a classroom for training of ticket

24   counter functions.  I mean, we all had that basic

Colleen Koslosky

Page 52

1   would get Caribbean flights.  We could get, like I
2   said, Jamaica, Montego Bay, or we would get -- I
3   don't know.  Pick an island.  You know, an island,
4   that wasn't a U.S. territory, we would have to work
5   those every so often.
6             As far as arrivals, the --
7   internationally, what would wind up happening is
8   that every so often any airplane that cleared
9   customs in the city of origin such as Ireland would
10  be one of them, they would come into -- they would
11  come into domestic.  But for the most part, any
12  kind of international flight primarily was kept
13  over in international.
14            Q.    For the last several years of your
15  employment, did you primarily work gates in the B
16  and C Terminal?
17            A.    I did.
18            Q.    Do you recall how many gates there
19  were in B Terminal?
20            A.    There were 15 gates in B because B12
21  did not exist.
22            Q.    Do you recall?
23            A.    They have B16 --
24            Q.    It's all right.

Colleen Koslosky

Page 53

1          A.     Sorry.  It goes to B16, but B12

2     doesn't exist.  B12 used to be the commuter gate.

3     And then over at C Concourse, it started at C17 and

4     I believe it ended at C31.  C31.

5          Q.     So, was that 14 or 15 gates over

6     there?

7          A.     Yes.

8          Q.     And of those gates and of the 15

9     gates in B Terminal, do you recall how many

10    American Airlines operated?

11         A.     All of them.

12         Q.     And is the same true --

13         A.     All of them.  In C, true.

14         Q.     The same is true in C?

15         A.     It is.

16         Q.     So, on a typical day at the airport,

17    planes are coming and going from all of those

18    terminals, right?

19         A.     Right.

20         Q.     How is it determined the last few

21    years of your employment which flights a particular

22    customer service agent would be responsible for

23    working at the gates?

24         A.     That was under the direction of a

Colleen Koslosky

Page 54

1   Mr. Larry Raikes.  Larry Raikes was the supervisor.

2          Q.    Customer service supervisor?

3          A.    I am sorry.  Customer service

4   supervisor that was responsible for delegating

5   where agents would go to.

6          Q.    And how were the schedules set and

7   then adjusted, you know, throughout the day for

8   flights that, you know, were coming in or leaving

9   late?  It doesn't seem like a work environment

10  where you can make a decision first thing in the

11  morning, this is what is going to happen, and then

12  assume that that is what is really going to happen.

13         A.    Of course.

14         Q.    Given weather delays and mechanical

15  delays and things like that?

16         A.    Sure.

17         Q.    So, practically speaking, how were

18  the assignments of particular gates given and then

19  adjusted for operational needs?

20         A.    Sure.  Philadelphia at the time

21  operated on banks of flights.

22         Q.    I am not familiar with that term,

23  so --

24         A.    Do you want me to elaborate?

Colleen Koslosky

Page 57

1    we all did -- we all pulled up our flights -- and

2    every so often, you got a zinger.  Every so often

3    there is something pulling into your gate, and that

4    is just the way it worked.

5           Q.    All right.  So, what I heard you say

6    is you would get a first flight that wasn't

7    necessarily at your assigned gate.  Then you would

8    be assigned to a gate for the day.  And you would

9    have a final flight that was often at your assigned

10   gate?

11          A.    More than likely.  More than likely.

12          Q.    All right.  How many customer service

13   agents worked a particular gate?

14          A.    That would be interesting.

15   Sometimes -- well, it depended.  It depended.  What

16   they tried to do is put two at a gate.  They tried.

17   Sometimes when there was a change in shift, when

18   there was overlap, there could be as many as three

19   to four agents assigned to a flight, up to 30.  I

20   have worked 757s by myself.  You know, it is one.

21   I've worked a seven-five by myself.

22          Q.    So, it varied?

23          A.    Well, it did.  But it is no -- I

24   mean, a flight is a flight.  It is great to have

Colleen Koslosky

Page 59

1        A.    And you know what, that is just the
2    way it is.
3        Q.    All right.  Was this system that you
4    described where you were primarily assigned one
5    gate for a day, was that the system in effect the
6    last several years of your employment?
7        A.    Yes, sir.
8        Q.    And how did you -- what was the
9    process for a customer service agent to learn where
10   he or she was assigned for the day?
11       A.    You would walk into the office --
12   originally, it was the B4 office -- and Larry would
13   be at his desk.  And it was at his discretion where
14   an agent would be placed for the day.
15       Q.    Okay.  And when Mr. Raikes was not
16   working, was somebody else performing that
17   function?
18       A.    They were.
19       Q.    And, so, you would report to the
20   office by Gate B4 to learn your assignment for the
21   day?
22       A.    Right.  That is correct.  It has
23   since changed.  The B4 office is now an Auntie
24   Anne's and now the check-in is still on B Concourse

Colleen Koslosky

Page 60

1  directly under -- if it hasn't changed, it is

2  directly underneath B5.

3       Q.    When did that change?

4       A.    That probably -- I'm going to

5  estimate two years.  Maybe a year and a half before

6  I left.

7       Q.    So, in 2016 and 2017, you were

8  reporting to an office near B5?

9       A.    That is underneath the airport.

10 Where the ramp is, where the mechanics are.

11      Q.    I understand.

12      A.    All their offices are down there.

13      Q.    So, that's ramp level?

14      A.    Yes, sir.

15      Q.    And the B4 office, was that?

16      A.    That was the original, and then they

17 changed it when they put a store in there.  And

18 then we went downstairs.

19      Q.    Was the B4 office where you had been

20 reporting, was that terminal level?

21      A.    That was terminal level.  It was.

22      Q.    Were the international agents

23 responsible for reporting to the B4 or B5 offices

24 to get their assignments?

Colleen Koslosky

Page 61

1          A.     They were not.   That was a separate
2     terminal.   Completely different.
3          Q.     What about the agents who worked in F
4     Terminal?
5          A.     No, sir.   That was over in F.
6          Q.     So, all the gate agents who were
7     working in the B or C Terminals were required to
8     report to the B4 and then the B5 office to receive
9     their assignments?
10         A.     That is correct.
11         Q.     Was there any way to receive your
12     assignment without reporting to that office
13     physically?
14         A.     There were some agents that would
15     text or call in.   Every so often I did that myself.
16     You know, where am I today?   Is there any briefing?
17     Where am I today?   Nothing is going on.   Your
18     gate -- here is your first flight.   There is your
19     gate.
20         Q.     Was --
21         A.     But for the most part -- sorry.
22     Excuse me.
23         Q.     Who could you call or text to get
24     that information?

Colleen Koslosky

Page 84

1   Rights; and Koslosky 3, Complaint, was marked for
2   identification.)
3   BY MR. FARRINGTON:
4        Q.    All right.  Take a look at what has
5   been marked as Exhibit 1.  Do you have it?
6        A.    Exhibit No. 1.  Exhibit No. 1, I have
7   it.
8        Q.    This is a charge of discrimination
9   that you filed with the EEOC and the Pennsylvania
10  Human Relations Commission, correct?
11       A.    That is correct, David.  Correct.
12            MR. KOLLER:  No, that is for you.
13            MR. FARRINGTON:  Yes, I will depose
14  Dave a different day.
15            MR. KOLLER:  It is to the best of
16  your ability.
17            THE WITNESS:  I am sorry.  I am just
18  learning this.  I am sorry.
19  BY MR. FARRINGTON:
20       Q.    No, it is okay.
21            So, Exhibit 1 is the Charge of
22  Discrimination that you filed with the EEOC and
23  Pennsylvania State Agency; is that right?
24       A.    That is correct.

Colleen Koslosky

Page 85

```
1          Q.    Is that your signature on the second
2   page of the charge?
3          A.    That is absolutely my signature, yes.
4          Q.    Who drafted -- if you know, who
5   drafted the narrative that is in this charge?
6          A.    I would say that this is my statement
7   to my attorney.  I would say that.  But who typed
8   it -- I did not type it, but this was a discussion
9   that I had with my attorney.
10         Q.    Okay.  And by signing the charge you
11  were attesting that everything that was alleged in
12  the narrative was truthful, correct?
13         A.    Absolutely.
14         Q.    And if you look at --
15         A.    Where?
16         Q.    The EEOC little stamp there.
17         A.    Yes, I do see it.
18         Q.    It looks like this was filed with the
19  EEOC on February 27, 2018?
20         A.    Okay.
21         Q.    Is that correct?
22         A.    It looks like -- well, it could be a
23  one -- I don't know.  It could be a one or a seven.
24         Q.    Do you recall if you filed this on
```

Colleen Koslosky

Page 86

1   February 21 or 27?

2           A.    I did not.  David filed it.  I did

3   not file it.

4           Q.    So, your testimony --

5           A.    I can't determine if that is a one or

6   a seven.  I don't know what that says.

7           Q.    Okay.  So, we think it was filed on

8   either February 21 or February 27, 2018?

9           A.    Well, there is something in there.

10  There is definitely something in there.

11          Q.    Is it one of the two things I said?

12          A.    Yes, it is either a one or a seven.

13          Q.    Okay.

14          A.    Pulling teeth, huh?

15          Q.    Is this the only Charge of

16  Discrimination that you filed against American

17  Airlines?

18          A.    Ever.

19          Q.    Is it the only Charge of

20  Discrimination that you ever filed against any

21  employer?

22          A.    Ever.

23          Q.    Take a look at Exhibit 2.  Exhibit 2

24  is the EEOC's Dismissal and Notice of Rights,

Colleen Koslosky

Page 88

1          A.    Did I review it?  Did I review it --
2          Q.    Did you review it to ensure that
3    everything that was alleged in here was accurate to
4    the best of your knowledge and information?
5          A.    That is correct.
6               (Exhibits Koslosky 4, Attendance and
7    Performance Guidelines; Koslosky 5, Overview of Social
8    Media Policy, were marked for identification.)
9    BY MR. FARRINGTON:
10         Q.    I've handed you Exhibits 4 and 5.
11   Can you confirm Exhibit 4 is the attendance and
12   performance guidelines for passenger service
13   employees?
14         A.    Yes, sir, that is what it says.
15         Q.    Do you see the effective date is
16   December 12, 2016?
17         A.    Yes, I do see that.
18         Q.    Do you agree as a customer service
19   employee you were subject to the policies reflected
20   in Exhibit 4 after September 12, 2016?
21         A.    Of course.
22         Q.    And then in Exhibit 5, the first
23   page, do you see down in the bottom right-hand
24   corner where it says American and a lot of zeroes

Colleen Koslosky

Page 89

1    and a five?

2            A.    I do.

3            Q.    Those are called Bates labels, Bates

4    Numbers.  So, the first page of Exhibit 5, which is

5    American 0005, is the company's social media

6    policy, correct?

7            A.    That is what it says.

8            Q.    And then American 6 through 9 is the

9    work environment policy, correct?

10           A.    That is right.  That is exactly

11   right.

12           Q.    Do you acknowledge that as a customer

13   service employee you were subject to both the

14   social media policy and the work environment

15   policy?

16           A.    Well, I never -- well, I never did

17   anything for the social -- that affected American

18   Airlines with the social media policy, but I

19   absolutely agree with the work environment policy.

20   Absolutely.

21           Q.    Yes.  I am not asking you to agree

22   that you violated the social media policy.

23           A.    Okay.

24           Q.    I am just asking you if you

Colleen Koslosky

Page 90

1   acknowledge that you were subject to it?

2           A.    Everybody would be subject to it,

3   sure.

4           Q.    Including you?

5           A.    Everybody.  Yes, of course.

6           Q.    As I read your Compliant --

7           A.    Yes.

8           Q.    -- I see a failure to accommodate

9   disability discrimination claim?

10          A.    Right.

11          Q.    Then I also see some claims about the

12  termination of your employment?

13          A.    Yes, that is correct.

14          Q.    I want to talk about the failure to

15  accommodate claim first.  All right.  As I read the

16  complaint, it appears that your allegation is that

17  you consistently asked to be assigned to Terminal B

18  exclusively?

19          A.    That is right.

20          Q.    As an accommodation for your

21  disability?

22          A.    That is correct.

23          Q.    Is American Airlines' failure to

24  grant that requested accommodation the basis for

Colleen Koslosky

Page 91

1    your failure to accommodate a claim?

2          A.    That is correct.  But there was a

3    circumvention that occurred that it was, in fact,

4    granted to me verbally, and then it was rescinded

5    by the same person that just the day prior had

6    given it to me.  So, yes, there is definitely a --

7    there is a problem.  There was a problem.

8          Q.    Yes, I am going to try to --

9          A.    I will try to answer the best that I

10   can, too.  I am so sorry.

11         Q.    No, you are doing fine.  If you are

12   answering thoroughly and truthfully, then you are

13   doing your job.  Okay?

14         A.    Okay.

15         Q.    This is just my chance to talk to you

16   about the claims in your lawsuit and so it's

17   important to me that I have a full and thorough

18   understanding for the basis for the claims, right?

19         A.    Sure.

20         Q.    I promise we will do a deep dive on

21   them.  I just want to make sure that I understand

22   there was one request for an accommodation; it was

23   to work exclusively on Terminal B, correct?

24         A.    That is correct.

Colleen Koslosky

Page 92

1          Q.     That was your consistent request for
2    several years?
3          A.     Several years.
4          Q.     Correct?
5          A.     That's correct.
6          Q.     Is there any other requested
7    accommodation that is at issue in this lawsuit?
8          A.     That was the only -- only thing that
9    I wanted.  That was it.  And, so, no, as far as the
10   accommodation, that is all that I wanted there.
11         Q.     There was no other requested
12   accommodation that you made that the company did
13   not grant, right?
14         A.     No.  No.  In the end.  In the end.
15   In the end, because this was a process of getting
16   to the end.
17         Q.     You are talking about working in
18   Terminal B?
19         A.     That is correct.
20         Q.     My question is, did you make any
21   request other than to be exclusively assigned to
22   Terminal B that the company didn't grant?
23         A.     No.  No.  No.  Uh-uh.  That is all I
24   wanted.  That was it.

Colleen Koslosky

Page 95

1    date that I had that done.

2          Q.    Was the most recent surgery the one

3    on your leg?

4          A.    That is correct.

5          Q.    Was that in 2013?

6          A.    Yes, it was.

7          Q.    Did you take a leave of absence after

8    the surgery?

9          A.    I did.  I did.

10          Q.    For how long?

11          A.    I don't even know.  Honestly, I don't

12    know.  Four months, five months maybe.  I don't

13    really -- honest to God, I don't know.  I don't

14    know.

15          Q.    When was the first time -- strike

16    that.

17                So, after the surgery you experienced

18    nerve damage in the leg that was operated on,

19    correct?

20          A.    Right.  I had severe edema.  I even

21    tried --

22          Q.    That means swelling, right?

23          A.    It's swelling, but it is also -- it

24    was the nerve damage.  And it -- I had -- per

Colleen Koslosky

Page 98

1        Q.    Started instantly and has lasted
2   until today?
3        A.    Oh, yes.
4        Q.    And the edema started instantly after
5   the surgery in 2013.  And although it is somewhat
6   improved, it continues to exist until today?
7        A.    It does and it's contingent.  Now,
8   don't misunderstand me, since I haven't been at the
9   airport as much or even running around because not
10  only did this severely affect my work environment,
11  but it has affected my private life as well.  So, I
12  guess the point I am trying to make is that what
13  was happening at work was also happening in my
14  private life as well.  There was no deviation from
15  the two.  So, you know, I wasn't out running the
16  boardwalk in the summertime.  It wasn't even
17  possible.
18       Q.    Okay.  I think your testimony is that
19  the disability that you asked to be accommodated
20  started after the surgery in 2013?
21       A.    Right.
22       Q.    And it's the same disability that you
23  continue to have today, correct?
24       A.    I do.

Colleen Koslosky

Page 99

1          Q.     And there is no other disability that
2     you asked to be accommodated?
3          A.     Absolutely not.
4          Q.     And the accommodation you requested
5     was exclusive assignment to gates in Terminal B?
6          A.     Right.
7          Q.     And that is the same accommodation
8     you requested from the beginning through --
9          A.     To the end.
10         Q.     -- through the end of your
11    employment?
12         A.     Right.
13         Q.     And when did you first request that
14    accommodation?
15         A.     Well --
16         Q.     And I have the written accommodation
17    request forms if that would help refresh your
18    recollection.
19         A.     No.
20         Q.     I was eventually going to get to
21    them.  If you want to see them now, I can show them
22    to you.
23         A.     No, that is fine.  No, that is fine.
24    I didn't even know that there was a reasonable

Colleen Koslosky

Page 110

1   don't think they could.  I don't think they had the

2   authorization to help.  And, so, finally -- I mean,

3   it was like a hamster wheel.

4               So, finally, I was taught -- after

5   years of this -- a co-worker said to me, you have

6   put this all down in an e-mail, right?  I am like

7   why would I write an e-mail when I can go right to

8   the person that can fix it?  She said, honey, you

9   can talk all day long.  Until you put that in an

10  e-mail, you just wasted, six, seven years of your

11  life.  And she was right.  Once I wrote that

12  e-mail, things started to change.  Some for the

13  good.  A lot for the bad.  But then ultimately, it

14  changed for the great.

15          Q.    Okay.  Was the first formal

16  accommodation request you made in August of 2016?

17          A.    That was, I believe, the first one.

18          Q.    Okay.

19          A.    Because Mike Whittle had requested

20  that I do a second one.

21          Q.    So, you were saying that before

22  August of 2016, when you made your formal request

23  for an accommodation, you had informally asked

24  various managers to instruct Larry to put you on

Colleen Koslosky

Page 119

1    Ty Northern, Christine Thompson, Nicole Blanchard,

2    Murphy, and Terrence, did you identify the need --

3    the reason that you wanted to be assigned

4    exclusively to Terminal B?

5            A.      Always.

6            Q.      And how did you express that?

7            A.      I would say to them, as you know, I

8    had this surgery, I am having a heck of a time with

9    this edema; I am having more problems with the

10   nerve damage.  And I would tell them it is the

11   walk.  I would say it's the walking.  It is the

12   walking on this tile, on this hard surface all the

13   way down to the C Terminal.  I said, could you just

14   see if I could be on the B Concourse.  I will go

15   anywhere you want me to.  It is just the walking.

16           Q.      And when you went to the people that

17   you've identified about that, were you asking them

18   on a shift-by-shift basis --

19           A.      I was asking --

20           Q.      -- or were you asking them for

21   permanent assignment to Terminal B?

22           A.      I was asking them as I saw what my

23   gate was for the day.  So, depending upon how Larry

24   delegated the gate assignments -- again, it is by

Colleen Koslosky

Page 127

1    would I want to undermine them?  You work with

2    them, you know.  If somebody has -- and but see,

3    that is just it.  That was what the problem was, is

4    that there was always excuses.  We are doing a

5    rotation.  That is why I can't give it to you.  We

6    are doing a rotation.  But that is not what was

7    happening.  It was -- I feel like I am in

8    kindergarten.  This is unbelievable.

9               If you were in good graces, you were

10   in good graces, and you weren't going to pay the

11   price.  If you weren't in good graces and you

12   didn't succumb to bullying and humiliation, you

13   were going to pay the price.  And I am not a meek

14   little girl.

15              (Exhibit Koslosky 6, Reasonable

16   Accommodation Request, was marked for

17   identification.)

18   BY MR. FARRINGTON:

19        Q.    I am handing you what has been marked

20   as Exhibit 6.  Can you take a look through that and

21   tell me when you've had an opportunity to do so?

22        A.    (Witness complies.)

23              I have.

24        Q.    Is what has been marked as Exhibit 6

Colleen Koslosky

Page 128

1   the first written request for accommodation you

2   submitted?

3          A.    Yes, sir.

4          Q.    And is the request that is reflected

5   in Exhibit 6 an accommodation for the nerve damage

6   and edema that you had been asking for an

7   accommodation for since 2014?

8          A.    Yes, sir.

9          Q.    Is the accommodation that you

10  requested in the document marked as Exhibit 6 the

11  exclusive assignment to Terminal B?

12         A.    Yes, it does say that.

13         Q.    That is the same accommodation that

14  you had been requesting since 2014?

15         A.    Yes, sir.  It looks like it.

16         Q.    It looks like all the writing on

17  Exhibit 6 with the exception of the healthcare

18  providers' information and signature is your

19  handwriting; is that right?

20         A.    That is correct.  That was taken off

21  of my -- that was taken off of my -- all of the

22  pathology reports and everything from the

23  University of Pennsylvania.  This is what I did so

24  that I didn't tie up my physician.  So, I would

Colleen Koslosky

Page 129

1   give it to the girls filled out -- my doctors loved
2   it -- they would go over all the information and
3   then they would sign it or they would not.  They
4   would make an adjustment.  But everything came off
5   of what had happened.
6            Q.    Right.  So, you filled out this form?
7            A.    I did fill out this form.
8            Q.    And the limitation that your doctor
9   certified was with respect to excessive walking and
10  heat; is that correct?
11           A.    That is right.  Because of the edema
12  when you have excessive heat, especially in the
13  summertime, the edema does affect it.
14           Q.    Other than meeting -- did you have
15  occasion to need to be outside for your job
16  responsibilities?
17           A.    The only thing that I had to do to be
18  outside of my job responsibilities was to meet an
19  airplane on the jetway.  That was it.
20           Q.    You weren't asking to be excused from
21  meeting airplanes on the jetway, were you?
22           A.    No, absolutely not.  I could do all
23  of my functions.  Every single thing I could do.  I
24  just didn't want all of that walking.  I didn't ask

Colleen Koslosky

Page 130

1  for anybody to lift anything.  I didn't ask anybody
2  for anything.
3        Q.    When you say you didn't want to do in
4  terms of walking, it was walking from Terminal B to
5  Terminal C?
6        A.    Only because that is where we checked
7  in, right.  That was it.
8        Q.    That was the excessive walking,
9  right, from Terminal B to Terminal C?
10       A.    Right.  Well, it was all the way at
11 the end of C.  That is the problem.  Now, sometimes
12 I would be -- because at the top of C Terminal you
13 have 16, 17, 18.  You have the gates up there.  I
14 was really good on big, heavy airplanes.  So, I
15 would sometimes -- a lot of times, actually -- I
16 would be given heavy flights.
17             But, again, body for body.  There is
18 there is no difference.  It didn't matter.
19       Q.    Yes, I am just -- so, you filled this
20 out.  I just want to make sure I understand when
21 you wrote excessive walking was your limitation?
22       A.    It was excessive walking.
23       Q.    What you meant was the walk from
24 where you had to check in at the B Terminal to the

Colleen Koslosky

Page 131

1    C -- to the gate to the C Terminal?

2           A.    Right.

3           Q.    Because you had told me earlier if

4    you knew you were assigned to C and could get off

5    the said shuttle bus at C Terminal, that wouldn't

6    be excessive walking?

7           A.    Well, no, because all I would have to

8    do -- if they had allowed me to pick up a phone and

9    call and if they were to say to me, your gate

10   assignment is C26 --

11          Q.    No problem?

12          A.    -- no problem.  That would be

13   fantastic.

14          Q.    And no one told you that you weren't

15   allowed to call the office for your gate

16   assignment, right?

17          A.    No, it wasn't done except when people

18   were running late.  Because -- because we had

19   briefings in the morning.  Nine times out of ten,

20   we had briefings in the morning.

21          Q.    Hold on a second.  Because I asked

22   you this question earlier.  I asked you what else

23   you had to do besides go in there and get your gate

24   assignment, and you told me there wasn't anything

Colleen Koslosky

Page 136

1   discussion about this situation.  And I may have

2   very well have gotten a letter in the mail.  Very

3   good chance that I got a letter in the mail.  Well,

4   obviously, I did get a letter in the mail, but my

5   conversations with Naomi were face to face.

6          Q.    Okay.  During the conversations that

7   you had with Naomi, did you discuss the concept of

8   using your seniority to bid into a different

9   customer service function that would not require

10  excessive walking?

11         A.    Absolutely not.  And there was no

12  reason to because what I was asking for was

13  nothing.

14         Q.    That is not my question.

15         A.    No, I didn't.  I didn't discuss it

16  with her, no.  No.  Bob Purey, yes.

17             (Exhibit Koslosky 7, Letter, was marked for

18  identification.)

19  BY MR. FARRINGTON:

20         Q.    You've been handed Exhibit 7.  Can

21  you confirm that this is an August 22, 2016 letter

22  from Naomi Postlewait?

23         A.    I can.

24         Q.    And did you receive this by mail?

Colleen Koslosky

Page 140

1    had been denied?

2            A.      After she told me.

3            Q.      That was your response?

4            A.      I wasn't being snarky.  The point I

5    am trying to make is nobody can plead your case

6    better than yourself.  So, that is why I decided to

7    see Beth.

8            Q.      So, during any of your conversations

9    with Naomi, did you discuss or did Naomi suggest

10   that you bid into a function that did not require

11   excessive walking?

12           A.      But the job that I had already did

13   not require excessive walking.

14           Q.      That wasn't my question.

15           A.      The question was I don't believe that

16   she did, but there is a possibility that she may.

17           Q.      I think I understand what you are

18   saying.  You are saying that is not something that

19   you would have considered if it had been raised

20   with you; is that correct?

21           A.      That is absolutely correct.  I never

22   would have considered that.  Because what I was

23   asking -- am I allowed to speak?  Am I allowed?  I

24   don't want to interrupt you.  I am trying to be

Colleen Koslosky

Page 141

1   good.  I am trying.  He gave me a lecture about

2   that, by the way.  No.  No.

3          Q.    You are saying no, you would not have

4   considered --

5          A.    I absolutely would not have

6   considered that.  There is a reason I would not

7   have considered that.

8          Q.    What is the reason?

9          A.    I don't even know if we are there

10  yet.  Are we going to go there?

11         Q.    To where?

12         A.    To Beth Norton.  Are we there yet?

13  In other words, you have a format that you want to

14  follow.  I don't want to, you know, go off on a --

15  if you want to address something.

16         Q.    Yes --

17         A.    Because we can go there, because that

18  was the next step was Beth Norton.

19         Q.    I am anticipating we are going to get

20  there pretty soon.

21         A.    Okay.

22         Q.    I was just trying to understand the

23  conversation that may or may not have happened with

24  you and Naomi about bidding into a CSA function

Colleen Koslosky

Page 144

1   services is under, I believe, the ticket counter.

2   I believe.  I didn't say that?

3          Q.    I think you said you thought it was,

4   but you didn't know.

5          A.    I am not absolutely sure.  They were

6   taking me out of my area of expertise for no

7   reason.

8          Q.    Well, nobody took you out of your

9   area of expertise.

10         A.    No, they didn't.  They didn't, thank

11  God.

12         Q.    I'd like to continue on the timeline,

13  but I just want to make sure we are on the same

14  page, that working at the ticket counter would not

15  require excessive walking.

16         A.    It does not require excessive

17  walking, not at all.  Excessive standing.  You are

18  standing for eight hours a day, seven hours a day.

19         Q.    Your accommodation request didn't

20  mention you had any problems with standing?

21         A.    No, it didn't.  That is exactly right

22  because the reason is when I work the gates, I have

23  the opportunity to sit down.

24         Q.    You can agree American Airlines can

Colleen Koslosky

Page 145

1    only rely on the information your doctor submitted,

2    right?

3              A.    Oh, of course.  I am saying on a

4    personal level, it afforded me the opportunity to

5    sit down.  That was just a luxury that came with

6    the gate position.

7              Q.    And re-check would not require

8    excessive walking, would it?

9              A.    I don't believe it would.  No, not at

10   all.  Uh-uh.

11             Q.    Special services, that is a sedentary

12   position?

13             A.    You are sitting all day.  Absolutely.

14             Q.    Special services wouldn't require

15   excessive walking?

16             A.    That is correct.

17             Q.    And working in POC, would that

18   require excessive walking?

19             A.    Yes, it could.

20             Q.    If you were a runner?

21             A.    See, you know our job better than you

22   are leading on to.  That is absolutely correct.

23   However, from what I --

24             Q.    Please.  Go ahead.

Colleen Koslosky

Page 146

1          A.      From what I understand, that is -- I

2     think that is on a rotating level.  Rotating, is

3     that correct, they do that on a rotation?

4          Q.      Well, my understanding is that it is

5     voluntary and that it's not -- if someone doesn't

6     volunteer for it, then it is on a rotation.

7          A.      Got it.  See, I did not know that.

8     But I did know, from what I heard from POC agents

9     that we ran into, everything was on a rotation.

10    So -- but it could have changed.

11         Q.      If you were working in POC and did

12    not have runner responsibilities, that wouldn't

13    require excessive walking, right?

14         A.      Absolutely.  That is absolutely

15    correct.

16         Q.      Okay.  So, we have gotten --

17         A.      And --

18         Q.      Was there anything you needed to

19    clarify?

20         A.      No.

21         Q.      So, we've gotten up to Naomi telling

22    you sometime in or around August of 2016 that

23    American Airlines was not going to grant the

24    accommodation request of exclusively working gates

Colleen Koslosky

Page 147

1    in the B Terminal?

2           A.    That is correct.  Obviously.

3           Q.    And your response to that was to

4    approach Beth Norton; is that correct?

5           A.    Right.  Right.

6           Q.    How long after Naomi told you that

7    the request was denied did you approach Beth?

8           A.    I would say it was relatively soon.

9    I don't know the dates.  I cannot tell you dates.

10   Maybe --

11          Q.    Within a week or so?

12          A.    I would say probably less than a

13   week.

14          Q.    And how did you -- did you have a

15   meeting with Beth?

16          A.    I did.

17          Q.    How did you get around to that

18   meeting?

19          A.    Well, her office at the time was

20   under B6.  And I called -- I think I stopped by.  I

21   think I stopped by.  I think I stopped by, and I

22   said, you know, is there any chance that I could

23   see Beth, and I think that her secretary set up a

24   time that she was available to see her.  And I did.

Colleen Koslosky

Page 148

1    And I went and saw her.

2         Q.    And how many meetings did you have

3    with Beth about your accommodation request?

4         A.    Just one.  That was all it took.

5         Q.    Was that meeting in Beth's office?

6         A.    That was in Beth's office -- in her

7    old office.

8         Q.    Who was present for the meeting?

9         A.    Just she and I.

10        Q.    How long did the meeting last?

11        A.    30 minutes -- less than 30 minutes.

12   And I just want to preface this, is that I am -- I

13   was very foolish not to take a union representative

14   with me.  I trusted my director.  I trusted her,

15   and so it was just she and I.

16        Q.    Okay.  And, so, presumably, you told

17   her about the accommodation, and Naomi had denied

18   it?

19        A.    I did.  It was great.  It was a great

20   little meeting, very quick.

21        Q.    Tell me what you remember about it.

22        A.    I remember a lot about it.  I was

23   sitting in a chair.  She was sitting at her desk.

24   I went over the accommodation.  I said, you know --

Colleen Koslosky

Page 149

1    and I explained everything that I explained to you

2    that, you know, it's the excessive walking.  I

3    showed her the surgery pictures.  We talked about

4    the picture of the dog on her wall.  And she was an

5    Irish girl, I am an Irish girl, so, you know, I

6    said -- I told her, I said, I don't care where you

7    put me.  I know I am being -- I am just repeating

8    myself over and over.  I am sorry.

9                  I said, I don't care where you put

10   me.  I don't care.  I am a gate agent.  I am a

11   really good gate agent.  Anywhere on B.  Doesn't

12   matter to me.  Just don't have me do all that

13   excessive walking.  And at the end of -- during the

14   midst of the conversation she said to me -- I

15   remember she adjusted herself in the chair.  I

16   remember her adjusting herself in the chair.  She

17   said, well, that is not exactly how Naomi explained

18   it to me.  And she said to me -- and I said to her

19   that is why I decided to come down and talk to you

20   directly.  And she stood up and she said, Colleen,

21   this is not unreasonable.  What you are asking for

22   is not unreasonable.  And she was very formal about

23   the way that she said it.  She said, I will grant

24   this accommodation.

Colleen Koslosky

Page 157

1    to see you in her office.

2         Q.    Did you realize within a week of your

3    meeting with Beth Norton that your request to be

4    assigned exclusively to Terminal B was not, in

5    fact, being accommodated?

6         A.    I kind of figured that out.  Now, I

7    am at my wits' end.  I am out of my mind because

8    now --

9         Q.    I just want to get the timing down.

10        A.    Yes.  I would probably say in less

11   than a week that there was definitely -- there was

12   something going on.  I don't know what it was.  I

13   hadn't a clue.  I had an inkling based upon what

14   was said to me.

15            But you have to understand something,

16   Larry had -- he had utter and complete disdain for

17   me.  I mean, this is a man, as I've said to you

18   before, who said to me when I walked into the B4

19   office to drop off the end of the day's

20   paperwork -- this is a man that said to me in

21   front -- and I can't tell you who saw it because it

22   was all new hires, they were all fresh faces -- who

23   said to me -- I didn't say anything, I just walked

24   in the door and he said, one day I am going to see

Colleen Koslosky

Page 160

1          Q.    Okay.  I want to respect your
2     request for lunch.
3          A.    Well, if you want to keep going, I
4     will keep going.
5                MR. FARRINGTON:  We will take a break
6     for lunch.  I want to respect that, and we will
7     take a break.  I want to make sure I -- we are
8     going to pick up on the timeline where we left off,
9     which was you realizing that the accommodation you
10    thought Beth had granted was not, in fact, being
11    implemented, and I believe that was sometime around
12    the end of August 2016, correct?
13               THE WITNESS:  Yes.  I do believe that
14    is true.
15               MR. FARRINGTON:  Okay.  We will pick
16    up there.
17               THE WITNESS:  Okay.  Lunch break.
18               (Break taken.)
19    BY MR. FARRINGTON:
20         Q.    We are back on the record after a
21    lunch break.  Were you able to get something to eat
22    or do whatever you wanted during lunch?
23         A.    Yes, sir, I was.
24         Q.    So, where we left off was you

Colleen Koslosky

Page 161

1    realized around the end of August 2016, that

2    despite Beth Norton telling you your request to

3    work exclusively on Terminal B was granted that, in

4    fact, it had not been granted.

5            A.    Well, the paperwork to approve it,

6    she didn't fulfill.  She didn't give the okay for

7    it to go forward.

8            Q.    Right.  You got a letter from Naomi

9    Postlewait saying the request was denied.  You had

10   a conversation with Beth that left you with the

11   impression that she had changed her mind.  And

12   then, you described the circumstances under which

13   you quickly realized that request had not, in fact,

14   been granted?

15           A.    That is correct.

16           (Exhibit Koslosky 8, Reasonable Request

17   Accommodation, was marked for identification.)

18   BY MR. FARRINGTON:

19           Q.    You've been handed a document that

20   has been marked as Exhibit 8.  Can you confirm this

21   is a second Reasonable Accommodation Request form

22   that you submitted in July of 2017?

23           A.    Yes, sir.

24           Q.    All right.  What happened between

Colleen Koslosky

Page 169

1          Q.    So, let's get the timeline down

2    because I think that e-mail occurred after your

3    second written request for accommodation was

4    denied?

5          A.    It did.

6          Q.    Let's break this into --

7          A.    Sections.

8          Q.    -- bite-sized pieces, okay.

9                So, turning back to Exhibit 8, this

10   is the second and last written Reasonable

11   Accommodation Form that you submitted, right?

12         A.    That is right.

13         Q.    And what you -- the disability that

14   you were attempting to -- that were -- strike that.

15               The disability that you were

16   requesting an accommodation for is the same

17   disability that you were requesting an

18   accommodation for --

19         A.    Originally, I guess.

20         Q.    -- in the document that was marked as

21   Exhibit 6, right?

22         A.    That is correct.

23         Q.    In the accommodation you were

24   requesting in the form that you submitted that has

Colleen Koslosky

Page 170

1  been marked as Exhibit 8, it's the same

2  accommodation that you were requesting in the form

3  that was marked as Exhibit 6, right?

4          A.    Yes, sir.

5          Q.    And it is the same disability and

6  same accommodation request that you had been asking

7  for since 2014?

8          A.    Yes, sir.

9          Q.    Who filled out the form that has been

10  marked as Exhibit 8?

11          A.    This was filled out by a nurse.  This

12  was filled out -- my sister Heather filled this

13  out.  My sister is a nurse.  I filled this out for

14  Dr. O'Brien, and I brought this to her office.  I

15  had an appointment with her.  And she looked -- I

16  had an examination.  She was working on my hips,

17  and she knew everything that was going on.  Doctor

18  -- she knew everything from the beginning,

19  everything.

20            And she looked over it, and she said

21  this is -- this is actually better than what any of

22  my people can write, and she signed it.

23          Q.    So, your sister filled out the form,

24  and Dr. O'Brien signed it?

Colleen Koslosky

Page 175

1    no way -- I was spinning my wheels again.  So,
2    anyway -- okay.
3         Q.    So, you spoke to Bob Yuri by phone
4    about your accommodation request, correct?
5         A.    I did talk to Bob Yuri on the phone
6    to answer your question that you originally asked.
7    I did.  I am sorry.
8         Q.    And when you spoke to Mr. Yuri by
9    phone --
10        A.    Yes.
11        Q.    -- did you discuss with him the idea
12   of bidding into another customer service function
13   that would not require long-distance walking?
14        A.    He brought it up.  It was -- and I
15   knew exactly what was happening.  It was so
16   ridiculous.  I was being circumvented at every
17   single turn.  Again.  Again, what I was asking for
18   as was told to me by a vice-president was nothing,
19   and consequently, he brought it up.  He brought up
20   the fact that, well, Beth is going to take you off
21   the gates, and she is going to put you into POC or
22   the ticket counter.  And I said, why would you ever
23   do that?  I am not asking for anything.  I am just
24   asking to get my schedule, walk upstairs, go to my

Colleen Koslosky

Page 176

1   gate, and stay there or in the general area.  I was

2   not one to walk all over the airport.  It wasn't

3   happening.

4              And then he proceeds to tell me,

5   well, we are giving you what you want, it is

6   just -- we are giving you -- I can't word it

7   properly.  We are giving you what you want or

8   something to the effect of we are trying to

9   accommodate you, but it is just not what you want.

10             And I said, no, you don't understand.

11  What I am asking -- why would you take somebody who

12  is a flipping superstar on the gates, take her off

13  the gates when all I am asking -- that is it -- I

14  am not asking for anybody to help me -- why would

15  you take me off the gates to take me and put me

16  into training for however long, two, four, six

17  weeks when all you have to do is say put her

18  somewhere on B.  That is all you have to do.  I

19  don't care what you do.  They were circumventing

20  me.  It was so obvious.  So --

21        Q.    Go --

22        A.    Go ahead.  No.

23        Q.    I just want to circle back to

24  something you said.  So, when Bob raised the idea

Colleen Koslosky

Page 177

1  of moving to you a customer service function that

2  did not require long-distance walking or excess

3  heat?

4          A.      Right.

5          Q.      He told you that for any function

6  that you weren't then presently trained in, the

7  company would provide training?

8          A.      They would provide training, but that

9  was my argument.  I said, why would you take -- I

10  am not asking for anything.  I am asking just to

11  put her on any gate on B, doesn't matter where it

12  is.  I am not going anywhere.  I am not walking the

13  airport.  I am not going over to C Concourse to my

14  favorite restaurant.  I am not doing -- okay.

15         Q.      I understand that you rejected the

16  idea.

17         A.      I did reject it.

18         Q.      You rejected the idea of taking

19  another customer service function, one that would

20  not require long-distance walking, correct?

21         A.      That is correct.  However, I want to

22  also say, if I may -- Why?  What was Beth doing?

23  Why was she doing this?  What I was asking for was

24  nothing.  Why did she flat-out deny our meeting,

Colleen Koslosky

Page 186

1   accommodating me to accommodate me because -- they
2   were circumventing me staying on the gate when
3   there was no reason to circumvent me.  I wasn't
4   asking for anything except to stay on the gates.
5   That is it.  That is all I was asking for.  And
6   remember, we are just talking a body for a body.
7   That is all we are doing.
8              (Exhibit Koslosky 9, E-Mail, was marked for
9   identification.)
10  BY MR. FARRINGTON:
11         Q.   I have handed you Exhibit 9, a
12  two-page exhibit.  The first page is Bob Yuri's
13  July 26, 2017 e-mail to you and an attachment,
14  which is the second page, on July 25, 2017, a
15  letter on American Airlines letterhead, correct?
16         A.   Yes, sir that is correct.
17         Q.   And you received the documents that
18  have been marked as Exhibit 9 on or about July 26,
19  2017?
20         A.   Yes, sir.
21         Q.   In the e-mail, the written response
22  to your accommodation request was that the request
23  to work exclusively on Concourse B was denied,
24  right?

Colleen Koslosky

Page 196

1    appeasing.  I said Beth, I am so sorry.  I didn't

2    realize that American Airlines did everything via

3    e-mail.  That was my circumventing.  That was my

4    deflection.  And I was just waiting for those

5    words.  I said Beth, did I get the accommodation?

6    Did you approve -- did you -- did you approve the

7    accommodation?  And she said, yes, I have approved

8    it.  I knew Olympia approved it.  She was making

9    Beth call because she's the one that was

10   circumventing for me for almost two years.

11          Q.    You do understand that Olympia

12   approved the accommodation request ultimately,

13   right?

14          A.    I do.  I do.  She did approve it.

15   And if you look at the e-mails that Olympia and I

16   shared back and forth, I was -- I was so grateful

17   to her.  I mean, it was over, and it was done.  I

18   had my protection.  He couldn't hurt me anymore.  I

19   could go and do my job.  I could clean my gate and

20   clean my drawers and vacuum my jetway.  It was

21   over.  It was done for me.

22          Q.    What --

23          A.    But I just -- oh, then -- and then

24   she friend-requested me on Facebook, which is the

Colleen Koslosky

Page 203

1   Theresa's name -- Theresa came up to me, and said I

2   saw it.  She said, you got your accommodation.

3              I said, I know.  I can come back to

4   work again.  I can't believe it.  He can't bother

5   me anymore.  I am done.  It is over.

6        Q.   And from -- I can tell you --

7        A.   May I ask a question if you don't

8   mind?  Did that e-mail, did that go out to

9   supervisors only?

10             MR. FARRINGTON:  Mr. Koller can share

11   the e-mail with you.

12             THE WITNESS:  Okay.

13   BY MR. FARRINGTON:

14        Q.   From the phone call you received from

15   Beth notifying you that you would be assigned

16   exclusively to Terminal B through the end of your

17   employment, were you assigned to Terminal B

18   exclusively?

19        A.   I sure was.  It was fabulous.

20        Q.   After you received the call saying

21   you were going to be assigned to Terminal B through

22   your termination date, did you have any other

23   discussions at work about your accommodation?

24        A.   No.  It was just simple

Page 226

1           IN THE UNITED STATES DISTRICT COURT
        FOR THE EASTERN DISTRICT OF PENNSYLVANIA

2
                       -   -   -
3
COLLEEN KOSLOSKY          : CIVIL ACTION
4            Plaintiff      :
                            :
5          vs.              :
                            :
6  AMERICAN AIRLINES, INC.  :
             Defendant      : NO. 2:18-cv-04654-PD
7
                       -   -   -
8
                 Tuesday, May 7, 2019
9
                       -   -   -
10
                    VOLUME II
11
                       -   -   -
12
            Oral deposition of COLLEEN KOSLOSKY,
13
taken at the offices of Veritext Legal Solutions,
14
Mid-Atlantic Region, 1801 Market Street,
15
Suite 1800, Philadelphia, Pennsylvania 19103,
16
commencing at 3:54 p.m. before Adrienne L.
17
O'Brien, Court Reporter and Notary Public.
18
19                     -   -   -
20
21
22
            VERITEXT LEGAL SOLUTIONS
23             MID-ATLANTIC REGION
         1801 Market Street, Suite 1800
24       Philadelphia, Pennsylvania 19103

Page 227

1   A P P E A R A N C E S:

2

3          KOLLER LAW, LLC
           BY:   DAVID M. KOLLER, ESQUIRE
4          2043 Locust Street, Suite 1B
           Philadelphia, PA  19103
5          215.545.8917
           davidk@kollerlawfirm.com
6          Representing the Plaintiff

7

8          FISHER & PHILLIPS LLP
           BY:   DANIEL F. FARRINGTON, ESQUIRE
9          7501 Wisconsin Avenue, Suite 1220W
           Bethesda, MD  20814
10         301.951.1538
           dfarrington@fisherphillips.com
11         Representing the Defendant

12

13

14

15

16

17

18

19

20

21

22

23

24

COLLEEN KOSLOSKY

Page 231

```
 1                      - - -
 2              COLLEEN KOSLOSKY, after having
 3    been previously duly sworn/affirmed, was examined
 4    and testified as follows:
 5                      - - -
 6                   EXAMINATION
 7                      - - -
 8    BY MR. FARRINGTON:
 9         Q.     You were suspended from work in
10    September of 2017, correct?
11         A.     I was.
12         Q.     All right.  And at the time of
13    your suspension, you had a Facebook account,
14    correct?
15         A.     And I still do, yes, sir.
16         Q.     And at the time you were suspended
17    or at least immediately before then, your Facebook
18    account was open to the public, correct?
19         A.     Totally open to the public.
20         Q.     There are options that allow
21    Facebook users to choose who can or can't see
22    their information, correct?
23         A.     Right.  That is correct, yes.
24         Q.     And you elected to set your
```

COLLEEN KOSLOSKY

Page 233

1           Q.    Okay.  You're not suggesting that

2    Facebook users couldn't tell that you worked for

3    American Airlines, are you?

4           A.    No, they -- well, if you were just

5    scrolling down, you would never know I worked for

6    American, ever.

7                       - - -

8                 (Whereupon, the document was

9    marked, for identification purposes, as Exhibit

10   Koslosky-11.)

11                      - - -

12   BY MR. FARRINGTON:

13          Q.    I'm handing you Exhibit-11.

14          A.    Okay.

15          Q.    Exhibit-11 is a Facebook post that

16   you made on January 17th, 2017, correct?

17          A.    Is it 2017?  I don't know.

18          Q.    Well, it's your post.  You wrote,

19   quote --

20          A.    Well, yeah, I know.  It was so

21   exciting.  Is it --

22          Q.    Let me finish my question.

23          A.    Okay.  I'm just trying to...

24          Q.    So, you wrote, quote, Holy Shit!

COLLEEN KOSLOSKY

Page 234

1    Look what I just found in my company e-mail!!

2                A.      Uh-huh.

3                Q.      And then you attached to that a

4    message from Doug Parker dated January 17th, 2017,

5    with the American Airlines logo, correct?

6                A.      Oh, absolutely.

7                Q.      Do you agree that anyone looking

8    at this post could tell that you were an American

9    Airline employee?

10               A.      If -- can I expand?

11               Q.      Can you answer my question first?

12               A.      Yes, if they went digging real,

13   real, real, real deep.  There was nothing.  The

14   normal person that goes through Facebook would

15   never have known, ever would have known.  They

16   would have had to have spent hours and hours and

17   probably days, to tell you the truth, to go

18   through to find that posting.  There was nothing.

19   If you were to go through -- if you were to -- if

20   you were just scrolling through and saw my name,

21   you never would have known who I worked for, ever,

22   except for this (indicating), which was --

23               Q.      Right.  "This" being Exhibit-11?

24               A.      Yes, exactly.

COLLEEN KOSLOSKY

Page 235

1      Q.    And anyone who saw Exhibit-11

2  could tell you worked for American Airlines,

3  right?

4      A.    Right, and I forwarded it to all

5  of these employees.

6      Q.    And you were friends with American

7  Airlines' coworkers on Facebook, correct?

8      A.    I was.

9      Q.    Approximately how many?

10     A.    Well, I'm going to have to -- just

11  to expand, I was friends with -- now with -- now

12  looking at it past that initial report, probably

13  about 85 or 95 people.

14     Q.    Coworkers?

15     A.    Yeah.

16     Q.    In September of 2017?

17     A.    Absolutely.

18     Q.    And they all knew you worked for

19  American Airlines, right?

20     A.    Well, we all knew each other

21  worked for American Airlines, yeah.

22               - - -

23            (Whereupon, the document was

24  marked, for identification purposes, as Exhibit

COLLEEN KOSLOSKY

Page 236

1    Koslosky-12.)

2                        - - -

3    BY MR. FARRINGTON:

4        Q.     I'm handing you what's been marked

5    as Deposition Exhibit-12.  It's Bates labeled

6    American 401.  This is something that you posted

7    to Facebook, correct?

8        A.     Absolutely, I did.

9        Q.     And we're going to have it as an

10   exhibit, so I see no reason to read it into the

11   record.  Can you explain to me why you posted

12   what's been marked as Exhibit-12?

13       A.     I can explain it.  All of this

14   fiasco started during the NFL's kneeling during

15   the National Anthem.  This was a paraphrase that I

16   lifted from Dan Pflaum from a gentleman by the

17   name of -- who originally said it, this -- who was

18   Professor Walter Williams.  Professor Walter

19   Williams is a Professor of Economics out of George

20   Mason University -- I sent David the original

21   article -- and that was it.  It was -- it was

22   poignant.  I thought it was very poignant.  I was

23   thinking of my ancestors, you know.  I was

24   thinking about these spoiled brat NFL players who

1    time 1,100, had anything to say about it.

2    Nothing.  They thought -- they understood exactly

3    what -- where it was coming from.  But that's my

4    point.  You can't have a knee-jerk reaction about

5    things unless you know where they're coming from.

6                    And that's exactly what this kid

7    did, this Jacob Marrero who is in Philadelphia --

8    well, I'll let you go through that.  I'm not going

9    to -- you can go through that at your leisure.

10   (Indicating.)  What he did -- and he's a punk.  I

11   don't know him.  I've only spoken to him one time

12   on the telephone, and that's when he was our -- he

13   was part of the Union Executive Board years and

14   years ago.  He took this post that he knew nothing

15   about, he didn't know the origins, where it came

16   from, who wrote it, where the article -- he knew

17   nothing.  He took that post and others -- they

18   cherry-picked them.  They went through the posts,

19   and they -- he shared them with the entire

20   company.  He forwarded this to everybody.

21   (Indicating.)

22                    Then what wound up happening --

23   okay.  Do you have any other questions about this,

24   or do you want me to continue on?  (Indicating.)

was picked up by a twice terminated American Airlines' employee by the name of Ty Maddox. It's all in here. (Indicating.) I don't know Ty Maddox. The only reason I know the name Ty Maddox is because of Ty Maddox at work. Ty Maddox --

MR. KOLLER: Wait. I just need to interrupt because Dan's question to you was did you write the post because it was poignant.

THE WITNESS: I did write this --

MR. KOLLER: I know, but you've got to listen to my point.

THE WITNESS: All right.

MR. KOLLER: I think you answered the question five minutes ago. So, stop and let him ask the next question.

THE WITNESS: I'm sorry, excuse me.

MR. KOLLER: And just focus on his question and answer his question.

THE WITNESS: I will. I'm sorry.

BY MR. FARRINGTON:

Q. Do you understand how saying black Americans should get down on their knees and give thanks that their ancestors were brought here as

COLLEEN KOSLOSKY

Page 242

```
 1   slaves could be interpreted as racially
 2   insensitive?
 3           A.      Not if somebody knew where it
 4   originally came from, not if they knew originally
 5   where it came from.  I was crucified based on
 6   things that people don't know.  He could have
 7   asked me about it.  Because I said to him, I said,
 8   have you lost your mind?  Reread it.  Reread it.
 9   Reread what it says.  This was all about the NFL
10   players.  That's all it was.  That's all it was.
11   It was just about being grateful for being in this
12   country.  That's it.
13           Q.      So, no, you don't understand how
14   this could be interpreted to be racially
15   insensitive?
16           A.      I guess if somebody was looking
17   for racism, yeah.
18           Q.      And I don't want to jump ahead --
19           A.      No, it's okay.
20           Q.      -- we're going to talk about the
21   complaints that this post and others --
22           A.      Oh, you bet.
23           Q.      -- generated.
24           A.      Uh-huh.
```

COLLEEN KOSLOSKY

Page 243

1           Q.      You're aware that they generated a

2     significant volume of complaints, right?

3           A.      Well, yeah, and we're going to

4     tell you how it got to that point.

5           Q.      Okay.  Do you have an explanation

6     for why so many people interpreted this post to be

7     racist in nature?

8           A.      Yes, I do, because of the way

9     Jacob spun it.  He was the one that saw it.  He

10    was the one that opted to tag everybody and to

11    forward it to everybody.  It was the way that it

12    was spun.  And if you get to learn about Jacob

13    Marrero, you will understand that everything is

14    race related.  There isn't a thing that's race

15    related.  There was no malice in this.  There was

16    no laughing about this.  This was -- I knew

17    exactly where it came from.  So -- and again, to

18    reiterate, so did other people, Walter Williams,

19    Walter Williams said that, that sounds just like

20    Walter Williams.

21                 So, I don't have knee-jerk

22    reactions.  When I read something, I don't just

23    have a knee-jerk reaction.  I want to understand

24    about it, so -- or where it came from or what did

COLLEEN KOSLOSKY

Page 244

1   you mean by that.  But that's not what Jacob did.

2   What Jacob did is he spun it and shared it with

3   every flipping employee he had, he -- and friends

4   and nonemployees.  I mean, he shared it far and

5   wide.

6           Q.     So, your view is that without

7   spin, just looking at the post that's been marked

8   as Exhibit-12 in isolation, no reasonable person

9   could view that as racially insensitive?

10          A.     Well, nobody that I knew did.  And

11  my -- I've got -- I have Hispanic, black, Latino,

12  there was not one person, not one, that had a

13  problem with that.  Not one person had a problem

14  with that because they understood it.  They

15  understood what they were -- what he was saying.

16  But Jacob twists everything.  He's -- look, I'm

17  not trying to deflect, I'm am not.  I'm not trying

18  to say -- but you don't take something that you

19  don't understand or at least question it, well,

20  what did you mean by that, I don't understand what

21  you mean by that, and share it with the entire

22  company.  Are you kidding me?  I went viral.  I

23  went all over the world.

24                 This was -- oh, my God.  It's --

COLLEEN KOSLOSKY

Page 246

1    I don't know these people.  I don't know any of

2    these people.  I may know maybe ten of them, but I

3    don't know any of these people.  They were out to

4    destroy me based on something that they didn't

5    understand or something that they didn't know.

6    That -- I can't be responsible for that.

7                    If he had an issue with me, he

8    should have messaged me and we could have had a

9    discussion, but if he -- this went all over the

10   world.  He put -- it was Ty Maddox that actually

11   made it go viral and employees that were egging

12   them on to make it go viral because they didn't

13   understand.  And if you read the responses to this

14   from other people, my friends, not posts that kind

15   of got a little crazy, there's nothing.  There is

16   absolutely nothing.  There's nothing there.

17         Q.    Okay.  So, your view is that

18   anyone who views the post that's been marked as

19   Exhibit-12 as racially insensitive just doesn't

20   understand it?

21         A.    They don't know where it came

22   from.  You have to know where it came from.  That

23   was my argument to him.  You don't know where

24   this -- you don't understand where this came from.

COLLEEN KOSLOSKY

Page 252

1    great cops out there.  So, this had nothing to do

2    with my coworkers, nothing, but Jacob -- Jacob

3    took it and he spun it.

4                    Again, none of the people that

5    were on my Facebook page, none of them took

6    offense to it because they understood that it was

7    true.  That's it.  I can't be responsible for how

8    people feel, as they can't be responsible for

9    what -- how I feel.  But I'm not going to destroy

10   your life, your career, I'm not going to destroy

11   it.  I'm going to shrug my shoulders and move on

12   because I have a nice relationship with them.  I

13   don't even know Jacob.  I don't know this guy.  I

14   don't know the people that reported it.  Because

15   this is what he does.  And I will show you proof

16   of that, what he's always done.

17        Q.    So, what is your explanation for

18   why people interpreted the post that's been marked

19   as Exhibit-13 as racist and complained about it?

20        A.    Because -- I believe because of

21   the way that he spun it.  The person that put --

22   collaged these posts -- he took -- cherry-picked

23   them, cherry-picked them, collaged the posts

24   and put them on the official American Airlines

COLLEEN KOSLOSKY

Page 253

1   Facebook and Twitter page, the official -- yeah,
2   both of them.  He pretended to be a passenger.  He
3   had been terminated once in Philadelphia.  He had
4   be terminated once in Miami.  And then there's
5   this Rachel McCray and she was another one that
6   put them on the Twitter page, my name, my face, my
7   base, everything.
8               And it -- Ty Maddox had a score to
9   settle with American, didn't he?  He had a score
10  to settle, and he did.  And I was worried -- when
11  I got ahold of Olympia when these animals -- these
12  animals were all over me over nothing, nothing, I
13  wasn't attacking anything, I was worried about the
14  brand.  I was worried about the brand because I
15  knew what he was doing.  I knew what Ty Maddox was
16  doing because I knew that he had been terminated
17  twice.  I found that out.  I knew he was -- he was
18  trying to hurt the airline.  I knew he was trying
19  to hurt the airline.  There was nothing I could
20  do.  It was -- it was out of control at that point
21  because of what Jacob Marrero did.  And I'm
22  scrambling because I'm thinking to myself, oh, my
23  God, what are they doing to American.  That is not
24  to say that I wasn't concerned about myself

COLLEEN KOSLOSKY

Page 259

1          A.     If they're looking for it.  If

2     they're looking for it.  If they're looking for

3     it.  That was not the intention.  I am not

4     responsible for what people think or they see.

5     I'm sorry.  I'm not responsible.  If they're

6     looking for racism, they're going to find it.

7     This was a basketball team that was rescinded.  I

8     happen to think that the president handled it well

9     because I would have done the same thing, but that

10    doesn't have anything to do with my coworkers.

11    I'm sorry that they feel that way.  It's crazy.

12                        - - -

13               (Whereupon, the document was

14    marked, for identification purposes, as Exhibit

15    Koslosky-15.)

16                        - - -

17               THE WITNESS:  Is that -- I love

18    that shirt.

19    BY MR. FARRINGTON:

20          Q.     I'm handing you Exhibit-15 --

21          A.     Uh-huh.

22          Q.     -- which is a picture of a shirt

23    on which there is a drawing of a stalk of cotton

24    and the words "Have you lost your cotton pickin'

COLLEEN KOSLOSKY

Page 260

1    mind?"  Correct?

2             A.      Right.

3             Q.      And is that something that you

4    posted to Facebook?

5             A.      I sure did.  I just love that

6    shirt.

7             Q.      To this day, you still love it?

8             A.      I do love it.  I actually bought

9    the plaque.  It's adorable.  It's so cute.  You

10   can buy this on eBay.  I mean, this is ridiculous.

11   I mean, come on.  I mean, you know, this is

12   ridiculous.  It's a flipping shirt.  It's

13   adorable.  It's so cute.  And you could buy this

14   stuff on eBay, eBay.  (Indicating.)

15            Q.      What are you proving to me by

16   showing me you can buy it on eBay?

17            A.      I'm just proving that this is

18   nothing.  It's just a shirt.  It's just a cute,

19   adorable shirt.  It's a shirt from -- the big

20   thing right now is the farmhouse motif within --

21   you know, within a home.  That's -- that is --

22   it's just a cute little shirt.  That's all it was.

23            Q.      Did you post what's been marked as

24   Exhibit-15 in response to the NFL kneeling

COLLEEN KOSLOSKY

Page 262

1    Baltimore, I know that you heard this your whole

2    life.  It's nothing.  It's no big deal.  And I saw

3    it, and I thought, oh, my God, isn't that the

4    truth, isn't that the truth.  Everybody is losing

5    their mind.  And I just saw it and I posted it.

6    It was nothing.  It's just a shirt.

7              Q.    Do you understand how the post

8    that's been marked as Exhibit-15 could be

9    interpreted to be racially insensitive?

10             A.    Absolutely not, only for somebody

11   that's looking for -- looking for something to be

12   race related.  This is an adorable shirt.  It's

13   nothing.  It's a shirt, for crying out loud.  Many

14   Americans have picked cotton, if that's what

15   you're implying.  People came over from Italy and

16   they picked cotton.  This is just a flipping

17   little shirt.  If you walk into Hobby Lobby, if

18   you walk into Michael's, if you walk into --

19   what's the other one, I can't think of it, the

20   other hobby store, you'll see this all over the

21   place.  It's adorable.  There's nothing wrong with

22   it.  But it's the person who is looking for

23   anything.  That's silly.  It's a shirt.

24                           - - -

COLLEEN KOSLOSKY

Page 263

1                    (Whereupon, the document was

2      marked, for identification purposes, as Exhibit

3      Koslosky-15.)

4                              - - -

5      BY MR. FARRINGTON:

6          Q.    I'm handing you what's been marked

7      as Exhibit-16.  Is Exhibit-16 a post that you made

8      to Facebook?

9          A.    I did.

10         Q.    And the post says, "We are losing

11     Blue Eyed People.  Too many are reproducing with

12     Brown Eyed People.  This is true."

13         A.    Uh-huh.

14         Q.    "So Blue Eyed People...UNITE!"

15         A.    Exactly.  I did post that.  And it

16     was funny because -- everybody -- all of my

17     friends were laughing because they said, oh,

18     isn't that interesting.  They're like we have a

19     beautiful Asian girl with blue hair.  I'm trying

20     to find the picture.  They were laughing.  They

21     thought it was hysterical.  Okay.  I had just read

22     a study in -- it was a science digest, and I had

23     seen that before.  And it's -- I have blue eyes.

24     Okay?  I like my blue eyes.  I'm proud of my blue

COLLEEN KOSLOSKY

Page 266

1  gave me what a lot of people want and spend a lot
2  of money for.  It's -- I was just talking about
3  blue eyes, not brown people with blue-eyed people.
4  I know a lot of people of color that have gorgeous
5  blue eyes.  What -- have people completely lost
6  their minds?  This is ridiculous.
7          Q.    You don't see how this could be
8  interpreted to be racially insensitive?
9          A.    Absolutely not.  I'm talking about
10 people with blue eyes.  I'm not talking about
11 brown people.  Brown-eyed people.  People have
12 brown eyes all over the place, every ethnicity,
13 but the people that are looking for race, they're
14 going to find it.  There's nothing racist in that.
15 There's nothing racist anywhere on my Facebook
16 page, nothing.  I kept it open for, like, 12 hours
17 after this fiasco started because I had absolutely
18 nothing to hide.  I wasn't against anybody at
19 work.
20          Now, I can read their stuff.  I
21 don't care.  I don't care.  I don't care.  It's
22 their -- they did direct things at me after all of
23 this came out and Jacob stirred the pot, but he
24 was the one that did it.  If it wasn't for him,

COLLEEN KOSLOSKY

Page 270

1   I just love him to death.  Well, he had just been

2   inducted to the African-American Museum in

3   Washington, D.C., finally -- big post about that,

4   you know.  I mean, these people don't -- they

5   don't know anything about me, nothing.  I haven't

6   even breathed the same air as these people.  I

7   don't know them.  So, anyway -- so, what he did is

8   he forwarded those posts that he cherry-picked --

9           Q.      Were they the posts that we've

10  identified?

11          A.      Yes, sir.  They are all of the

12  posts that were identified -- that he did not

13  like, and he forwarded them to every single

14  person that he knew.  In doing so -- and tagged

15  everybody, and I'm talking people everywhere.  In

16  doing so, it was picked up by other employees.

17  They were -- you can read through all of this.

18  (Indicating.)  Employees that worked in

19  Philadelphia, open it up, make it go viral, it's

20  going viral.  You know, I mean, even people were

21  saying, are you reading something that I'm not

22  reading because I'm not seeing anything here to

23  all of these people.

24                  And so, anyway, it was -- it was

COLLEEN KOSLOSKY

Page 271

```
 1   just -- it was a snowball effect.  It was an
 2   absolute snowball effect.  Ty Maddox, like I said,
 3   picked it up, collaged it, put it -- at two
 4   o'clock in the morning or one o'clock in the
 5   morning, put it on the official American Airlines
 6   Facebook and Twitter page.  A Rachel McCray, who I
 7   believe had been terminated as well, she -- she
 8   either put it on -- I think she put it on Twitter,
 9   and, you know, saying -- oh, my God -- well, I've
10   got it all here.  (Indicating.)  But anyway -- so,
11   from there, it just took -- it took a life of its
12   own, and Jacob Marrero was the ring leader.  He
13   was getting -- he was getting everybody riled up,
14   absolutely riled up and --
15             Q.    Did you know Jacob Marrero?
16             A.    I never met him.  I only talked to
17   him one time on the telephone.  The reason I
18   talked to him on the telephone was because he was
19   part of the Executive Board at one time with the
20   company.  I've never laid --
21             Q.    You mean of the union?
22             A.    I'm sorry, of the union.  I have
23   never laid eyes on him.  The only way that I know
24   him now is because I've seen pictures of him on
```

COLLEEN KOSLOSKY

Page 279

1      Q.      All right.  And you understand

2  that passengers complained that you had made posts

3  that were racist in nature?

4      A.      Okay.  But, however, the reason

5  that that happened was because of Jacob -- no,

6  well, okay, I guess they did, but -- okay.  That's

7  because they were -- that's because they were

8  forwarded on.  In other words, it wasn't because

9  they came to my page and found something.  It was

10 ridiculous.  It was -- they never would have known

11 I worked for American other than that little blip

12 that you saw about the free passes which everybody

13 was excited about.  But that was so deep, they

14 had -- you had -- or whoever, they had to go so,

15 so deep into my Facebook page to find that.  If

16 anybody was just going through, they never would

17 have known.

18     Q.      And once Jacob forwarded the

19 posts, it was abundantly clear that you were an

20 American Airline employee, right?

21     A.      No.  They identified me, that's --

22 no, that's what I'm saying though.  Yes, because

23 he identified me.  It's not because I identified

24 myself.

COLLEEN KOSLOSKY

Page 272

1   Facebook.  I mean -- okay.  So, anyway, I was up
2   for 36 hours.  I received -- because of what they
3   did, they posted my face, they posted my base,
4   they posted -- you can have all of this as far as
5   I'm concerned.  (Indicating.)  They -- I had
6   passengers calling me at home.  I had passengers
7   calling me.  I had passengers and employees
8   that were -- that were calling me on Facebook
9   Messenger.  I had passengers that were making --
10  and other employees that were going onto my actual
11  Facebook page because I wasn't shutting it down.
12  Why would I shut it -- that's ridiculous.  If you
13  can't -- this has nothing to do with you.  If you
14  can't -- if you can't come to the realization that
15  people aren't against you, but they might not
16  agree with your opinion, it doesn't mean that they
17  hate you, for God's sake.  So, anyway, retirees --
18  retirees -- I had a police report because I had
19  death threats.  Here's my police report.
20  (Indicating.)
21          This one individual, this one
22  person, created this absolute havoc.  I was
23  getting phone calls from people who really wanted
24  to help me from other cities.  And -- Pat Brislin,

COLLEEN KOSLOSKY

Page 273

```
 1   well, she's a supervisor in Fort Lauderdale, she
 2   called me and she said, Colleen, passengers are
 3   talking about you up in Seattle; I just got a
 4   phone call from an agent in Seattle.  This coming
 5   in from everywhere.
 6               I had a nervous breakdown.  I
 7   mean, they were -- it had taken on a life of its
 8   own over nothing, but yet, you know -- but you
 9   can -- but yet, you know, Laurie Marks -- Laurie
10   Marks, an agent in Philly -- Ty Maddox, here's
11   what he actually posted on American Airlines
12   showing -- posing as a passenger -- a twice
13   terminated employee who had an ax to grind.
14               Employee -- the utter and complete
15   filth that I got from these employees -- Dave
16   Thomas put my picture everywhere -- employee in
17   Philly, everywhere.  I don't even know who Dave
18   Thomas is.  I don't even know who the guy is.  I
19   mean, it's endless.  It's absolutely endless.
20   It's endless.
21               Val Florves, who was a
22   supervisor -- and I like these people.  I mean,
23   it's hurting me to tell you this because I like
24   these people.  And I mean -- oh, my God, I mean,
```

COLLEEN KOSLOSKY

Page 274

1   Val Florves, holy moly, she had a fiasco with me,

2   but it was all stirring the pot, stirring the pot.

3   And, like I said, it just took on a life of its

4   own, and I -- it was so --

5              Q.     How quickly?

6              A.      -- it was so out of control

7   because of Jacob.  That was the nucleus.  And it

8   was so out of control, people that I had worked

9   for for years, I mean, Val, and -- I mean, have a

10  field day.  (Indicating.)  What they did to me on

11  that -- and then what they did is they went to the

12  closed American Airline groups, flight attendant,

13  agent combined, you know, different ones that we

14  have to share information, I had to get ahold of

15  Tom Gunning.  Tom Gunning was an administrator of

16  one of the websites.  And I had -- oh, my God, it

17  was unbelievable.  I said, Tom, please, take that

18  down, please, take that down.  I said, the person

19  that is posting that has been terminated twice

20  from American, talk to Barbara Tobin, who was our

21  union president at the time, and she will explain

22  to you what happened.

23                   It was out of control.  I mean --

24  but it was the cherry-picking.  It was the

COLLEEN KOSLOSKY

Page 275

1    cherry-picking that -- and anything that they did

2    not like, they used against me.  When they called

3    me in for my first interrogation, I went in my

4    uniform.  I was going back to work.  I'm there to

5    work.  I'm not there -- if you're mad at me, okay,

6    that's fine, you can be mad at me.  Then they

7    used -- then some employees, some coworkers, used,

8    well, she's creating a hostile work environment.

9    I'm not creating a hostile work environment.  I'm

10   coming in here zip-a-dee-doo-dah.  I'm -- that's

11   how I walked into work, all smiles.

12              After my first interrogation with

13   Jenny O'Neill and Nicole Blanchard, Greg Cassavaw,

14   my union representative, was right next to me.

15   Jenny O'Neill, senior manager, came up to me, she

16   gave me a hug.  She said, Colleen, you are the

17   victim here, you did nothing wrong, and we know

18   exactly what's going on.  Now, what that "we know

19   exactly what's going on" is, I don't know what

20   that is, but that's what she said to me.

21         Q.    So, the posts that we've

22   identified as Exhibits-12 through -16, I think

23   this is your language, they went viral, correct?

24         A.    They went all over the world, all

COLLEEN KOSLOSKY

Page 279

1          Q.      All right.  And you understand

2    that passengers complained that you had made posts

3    that were racist in nature?

4          A.      Okay.  But, however, the reason

5    that that happened was because of Jacob -- no,

6    well, okay, I guess they did, but -- okay.  That's

7    because they were -- that's because they were

8    forwarded on.  In other words, it wasn't because

9    they came to my page and found something.  It was

10   ridiculous.  It was -- they never would have known

11   I worked for American other than that little blip

12   that you saw about the free passes which everybody

13   was excited about.  But that was so deep, they

14   had -- you had -- or whoever, they had to go so,

15   so deep into my Facebook page to find that.  If

16   anybody was just going through, they never would

17   have known.

18         Q.      And once Jacob forwarded the

19   posts, it was abundantly clear that you were an

20   American Airline employee, right?

21         A.      No.  They identified me, that's --

22   no, that's what I'm saying though.  Yes, because

23   he identified me.  It's not because I identified

24   myself.

COLLEEN KOSLOSKY

Page 282

1   point -- no, because -- no, because -- because I

2   was dealing with the raccoons, for Christ sake,

3   but the point is, no, I had absolutely no idea.

4   However, I did also hear through conversation from

5   people that called me that American Airlines was

6   being held hostage because they were told if they

7   didn't fire me that they were going to go to the

8   media.

9           Q.     Employees told the company that?

10          A.     Yes, sir.

11          Q.     And you're aware that employees

12  both inside and outside of Philadelphia complained

13  about your posts, correct?

14          A.     I did not know that -- I did not

15  know about -- well, I knew about the outside only

16  after I was told that I had death threats.  That's

17  when I found out about it.

18          Q.     So, yes, you know that employees

19  in and out of Philly complained?

20          A.     Well, they had to complain.  It

21  went viral.  It went all over the world what they

22  did to me.  So, anybody that had an American

23  Airlines app saw it.

24          Q.     Okay.  Do you understand why press

COLLEEN KOSLOSKY

Page 285

1  start screaming, oh, this is a hostile work

2  environment -- there was no hostility.  That's

3  ridiculous.  It's just somebody with a different

4  opinion.  I'm not against you, ever.  I was

5  working -- I was the one in the hostile work

6  environment.  It was fine.

7          Q.      So, listen to my question.  Are

8  you aware that employees reported that they

9  weren't comfortable working with you in light of

10 your posts?

11         A.      That's what I said.  They wrote it

12 in here.  Of course they did.  That was -- that's

13 part of it.  That's part of the whole thing.

14         Q.      Yes, you're aware of that?

15         A.      Well, now that I am, but I knew

16 that they were because they posted it in here.  I

17 saw it.  That's what they kept on saying.  They

18 kept on saying, oh, my God, we can't work around

19 this person, they're terrible.

20         Q.      Do you know what EthicsPoint is?

21         A.      Sure.

22         Q.      And what is EthicsPoint --

23 American Airlines EthicsPoint?

24         A.      It's just American's ethics, I

COLLEEN KOSLOSKY

Page 287

1    took an opportunity to cherry-pick through posts

2    that he did not like, and ultimately he put them

3    out to every single person that he knew, picked up

4    by terminated employees that had scores to settle,

5    put them on the official American Airlines'

6    Facebook and Twitter page, and they had a field

7    day.  That's exactly what happened.

8                          - - -

9                    (Whereupon, the document was

10    marked, for identification purposes, as Exhibit

11    Koslosky-17.)

12                          - - -

13                    MR. FARRINGTON:  Dave, can you

14    make sure that we are not mixing the --

15                    THE WITNESS:  No, we're not.  I

16    got it.

17                    MR. FARRINGTON:  -- deposition

18    exhibits in with that bag of papers?

19                    MR. KOLLER:  Can you put all of

20    the documents to the side?

21                    THE WITNESS:  Okay.  I'd be happy

22    to.

23    BY MR. FARRINGTON:

24            Q.    So, I tried to put in front of you

Page 288

1    Exhibit-17?

2         A.    Oh, from Joe, the thing from Joe,

3    Joe Wilson.

4         Q.    This is your suspension letter,

5    correct?

6         A.    That is correct.

7         Q.    How were you informed that you had

8    been suspended?

9         A.    Joe Wilson called me at home, and

10   we had a nice little chitchat, and he was lovely.

11   And he said, we're just going to put you out.  And

12   I had a nice conversation with Joe, but -- and

13   that was it.

14        Q.    Okay.  And then how did you

15   receive the letter that's been marked as

16   Exhibit-17?

17        A.    I believe I got this via U.S.

18   Mail, and I do have this letter.

19        Q.    But this wasn't news to you when

20   you received it; you already knew you had been

21   suspended?

22        A.    Yeah, that's correct, because I

23   had a conversation with Joe.

24        Q.    Okay.  You told Olympia and Mike

COLLEEN KOSLOSKY

Page 290

1          Q.     All right.  And you had a meeting

2    on September 29th with Nicole Blanchard and Jenny

3    O'Neill, correct?

4          A.     I did.

5          Q.     And you were represented at that

6    meeting by a union rep named Greg Cassavaw?

7          A.     That's correct.

8          Q.     Am I correct that two union

9    representatives refused to represent you before

10   Mr. Cassavaw finally agreed?

11         A.     That's true.  Suzette Lewis was on

12   her way to Washington, D.C.  She was on --

13   actually, she was on her way to the African-

14   American Museum, and Don Peterson was in Venice.

15         Q.     And so, is it your testimony that

16   they were physically unable to represent you, not

17   that they declined to represent you in light of

18   the circumstances?

19         A.     Well, Suzette never declined.

20   I've known Suzette since our Cleveland days.  And

21   Suzette only -- she never said that she declined

22   because of any other reason other than the fact

23   that she was going on this jaunt.

24                          - - -

COLLEEN KOSLOSKY

Page 305

1   material was left out of that memo?

2          A.     I don't think so.  I don't think

3   so.  You know, other than -- you know, I did --

4   well, I did try to -- and they squashed me, I

5   tried to -- you know, I tried to say but you

6   don't -- but there are other employees that are

7   the polar opposite and they're just skipping

8   along, but what I did was, you know, nothing,

9   nothing compared to what other people did.  And,

10  like I said, I would never, ever would I want to

11  destroy somebody's career over a difference of

12  opinion.

13                     - - -

14          (Whereupon, the document was

15  marked, for identification purposes, as Exhibit

16  Koslosky-19.)

17                     - - -

18  BY MR. FARRINGTON:

19          Q.     I'm handing you Exhibit-19 --

20          A.     Okay.

21          Q.     -- can you confirm that's your

22  termination letter?

23          A.     That is my termination letter.  It

24  is, yes, sir.

COLLEEN KOSLOSKY

Page 308

1        Q.      Okay.  So, you sent an e-mail to

2    Jenny on October 2nd regarding Tom --

3        A.      Doersam.

4        Q.      -- Doersam's, D-O-E-R-S-A-M,

5    Facebook page?

6        A.      Right.

7        Q.      And I've seen some other

8    references to Tom.  I'm correct, aren't I, that

9    you never complained about Tom Doersam's posts to

10   the company, correct?

11       A.      Never, because he's entitled to

12   his opinion.  He never hurt anybody.  It was his

13   opinion.  He's a great guy.  I mean, he's a

14   terrific guy.  We just have a difference of

15   opinion.  All of this is difference of opinion.

16   But why would I want to destroy his life?  I don't

17   want to destroy his life.

18       Q.      Are you aware of anyone

19   complaining to the company about Tom Doersam's

20   Facebook posts?

21       A.      I don't know because, again, to

22   reiterate, I really didn't get involved in the

23   mechanics of the airport.  But people would say,

24   oh, boy, did you see what Tom had to say, you

COLLEEN KOSLOSKY

Page 316

1    relatively quickly.

2          A.     Okay.

3          Q.     You filed a grievance challenging

4    your termination, correct?

5          A.     I did.

6          Q.     And the grievance was denied at a

7    Step Two hearing?

8          A.     It was.

9          Q.     And am I correct that the union

10   declined to take your grievance to arbitration?

11         A.     The union -- yes, sir.  The

12   union -- if I can expand on that, the union

13   declined because everywhere it said American

14   Airlines -- that I worked for the world's -- what

15   is it -- largest airline -- that I identified,

16   identified, identified, I never identified myself.

17   But they -- there's more to it but, yes, they did

18   decline it.  I was also denied representation by

19   the union.

20         Q.     Representation in what?

21         A.     American Airlines was fighting my

22   unemployment and -- I know, but -- okay.

23         Q.     Okay.  So, when you say "denied

24   representation", you're talking about your

COLLEEN KOSLOSKY

Page 318

1    BY MR. FARRINGTON:

2          Q.      You've got Exhibit-20 there which

3    is a letter you wrote to an Edward Mooney in

4    response to the Union's decision to not proceed

5    with an arbitration, correct?

6          A.      That's correct.

7          Q.      In the letter you make reference

8    to a person who set you up?

9          A.      That's correct.

10         Q.      Is that person Jacob Marrero in

11   your opinion?

12         A.      That person is definitely Jacob

13   Marrero in my opinion with a few other

14   accomplices.

15         Q.      Okay.  On page 256 of that

16   exhibit --

17         A.      Yes, sir.

18         Q.      -- the last full paragraph starts,

19   "I was terminated to quiet a mob."

20         A.      That's right.

21         Q.      Is it your view that American

22   Airlines was motivated to terminate your

23   employment to "quiet the mob"?

24         A.      One hundred percent, absolutely,

COLLEEN KOSLOSKY

Page 323

1    with and they'll bring the company down with them.

2    And I think that's a dangerous place to be -- just

3    my -- you know, just my last thoughts.

4                         - - -

5                    (Whereupon, the document was

6    marked, for identification purposes, as Exhibit

7    Koslosky-21.)

8                         - - -

9    BY MR. FARRINGTON:

10           Q.      I'm giving you Exhibit-21.

11           A.      Yes.

12           Q.      It's a June 27th, 2018 letter from

13   Ed Mooney to you, correct?

14           A.      That is correct.

15           Q.      And is this Mr. Mooney's response

16   to the letter you wrote that was marked as

17   Exhibit-20?

18           A.      That's correct.

19           Q.      In the letter did Mr. Mooney

20   decline your appeal to take the case to

21   arbitration?

22           A.      He did.

23           Q.      And did he find that an arbitrator

24   would easily find American had just cause to take

COLLEEN KOSLOSKY

Page 343

1          Q.     You're not contending that you

2    were terminated because you have a disability?

3          A.     I am not contending that I was

4    terminated because I had a disability.  What I

5    am contending is the circumvention of the

6    accomodation for absolutely no reason.  That's the

7    problem.  There was no reason not to grant me the

8    accommodation that I was seeking as evident by the

9    signature of Olympia Colasante.

10         Q.     So, I saw your disability claim as

11   three-fold, and I think you clarified that it's

12   not.  So, let me tell you what I thought it was,

13   and you can clarify for me.

14         A.     Sure.

15         Q.     Okay?  I understood you to be

16   complaining that the company did not accommodate

17   your disability by assigning you to Terminal B

18   exclusively for a period of time until Olympia

19   stepped in, right?

20         A.     That is correct.

21         Q.     That's one prong of your claim,

22   right?

23         A.     That is absolutely correct.

24         Q.     Okay.  And I thought you were

COLLEEN KOSLOSKY

Page 344

1    alleging that the person who terminated you was

2    motivated to do so because of your disability, and

3    you've told me that's not correct, that's not what

4    you're alleging?

5            A.      No, that -- no.

6            Q.      Got it.  The third part of what I

7    thought you were alleging in your claim was that

8    the person who terminated you did so to retaliate

9    against you for having asked for an accommodation;

10   is that part of your claim?

11           A.      Not asking for the accommodation,

12   humiliated because for over a year she did

13   everything that she could do to circumvent that.

14   I'm trying to answer the question, I really am.

15           Q.      So, that circles back to you not

16   getting the accommodation in the first place, and

17   I understand that's part of your lawsuit.

18           A.      Right.

19           Q.      I got it.

20           A.      Okay.

21           Q.      Are you contending that the fact

22   you asked for an accommodation played a role in

23   the decision to terminate you eventually?

24           A.      Not at all.  No, not at all.  No,

COLLEEN KOSLOSKY

                                        Page 345

1   because when I originally -- you know, you have to
2   go -- you have to go through the steps of -- you
3   know, you have to go to Human Resources, and you
4   have to -- you know, you try to do the best that
5   you can do after you've exhausted everything on
6   the floor, you know -- the gates on the floor,
7   that's what I mean.  So, then, you know, you go
8   upstairs, you try to do the proper thing.
9                 And, again, at the expense of
10  being repetitive, you know, that's why I went to
11  her directly because nobody could speak for myself
12  other than me, and it worked out brilliantly for
13  about three hours, and then she disappeared off
14  the face of earth until she fired me.
15          Q.     You're talking about Beth again?
16          A.     Yeah.  And I liked Beth.  She was
17  great.
18          Q.     All right.  So, you're definitely
19  alleging that the company did not accommodate your
20  disability in a timely fashion?
21          A.     Absolutely.
22          Q.     Got it.  And then with respect to
23  the termination, the legal claim is limited to
24  your allegation that you were terminated because

COLLEEN KOSLOSKY

Page 346

1    of your gender, correct?

2            A.      That was part of it only because

3    of the repetitiveness of what I was seeing.

4            Q.      And what's the other part?

5            A.      That's the part.

6            Q.      Okay.  And then you also told me

7    earlier that you think the company was -- I think

8    the word you used was blackmailed or motivated to

9    quell the mob, correct?

10           A.      Absolutely.  Absolutely.

11           Q.      Okay.  And you're not contending

12   your disability or the fact that you had asked for

13   an accommodation played a role in the decision to

14   terminate?

15           A.      No.  It was the fact that they

16   wouldn't -- they -- no, they circumvented me at

17   every turn to get that accommodation.

18           Q.      Okay.

19           A.      It wasn't the asking of the -- the

20   initial asking of the accommodation.  It was the

21   circumvention and the abject lying that was going

22   on so that I wouldn't get that accommodation which

23   I'm still trying to figure out what the big deal

24   was.  But in the interim, in the interim, and me

EXHIBIT

Koslosky-1
RC 5-7-19

PENGAD 800-631-6989

EEOC Form 5 (5/01)

| CHARGE OF DISCRIMINATION | | Charge Presented To: | Agency(ies) |
|---|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | | ☐ FEPA<br>☒ EEOC | |

**Pennsylvania Human Relations Commission** _____ and EEOC

*State or local Agency, if any*

| Name *(indicate Mr., Ms., Mrs.)*<br>**Colleen Koslosky** | Home Phone *(Incl. Area Code)*<br>(856) 904 3567 | Date of Birth<br>█████ |
|---|---|---|
| Street Address<br>**110 Whitman Avenue** | City, State and ZIP Code<br>**Stratford, NJ 08084** | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. *(If more than two, list under PARTICULARS below.)*

| Name<br>**American Airlines, Inc.** | No. Employees, Members<br>**50+** | Phone No. *(Include Area Code)*<br>(800) 364 5259 |
|---|---|---|
| Street Address<br>**8000 Essington Avenue** | City, State and ZIP Code<br>**Philadelphia, PA 19153** | |
| Name<br>**American Airlines, Inc.** | No. Employees, Members<br>**50+** | Phone No. *(Include Area Code)*<br>(817) 963 1234 |
| Street Address<br>**4333 Amon Carter Boulevard** | City, State and ZIP Code<br>**Fort Worth, TX 76155** | |

| DISCRIMINATION BASED ON *(Check appropriate box(es).)* | DATE(S) DISCRIMINATION TOOK PLACE |
|---|---|
| ☐ RACE   ☐ COLOR   ☒ SEX   ☐ RELIGION   ☐ NATIONAL ORIGIN<br>☒ RETALIATION   ☐ AGE   ☒ DISABILITY   ☐ OTHER *(Specify below.)* | Earliest FEB 2            Latest 10/6/2017<br>☐ CONTINUING ACTION |

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s)):*

I.   On December 12, 1983, I was hired by US Air as a Customer Service Agent in a location in New York City, NY. In April 1992, I was transferred to the Philadelphia International Airport. On December 9, 2013, US Air merged with Respondent and I became an employee of Respondent. On October 6, 2017, Respondent terminated me. I have a disability that substantially limits major life activities. I am a "qualified individual with a disability" as that term is defined under the ADA because I have, or had at all time relevant hereto, a disability that substantially limits or limited one or more major life activities or because I had a record of such an impairment or because I was regarded as and/or perceived by Defendant and its agents as being disabled.

II.   In or around 2008, I was diagnosed with a disability. In or around 2010 I was required to have a procedure to treat my disability. In or around 2013, I had a second operation conducted by Dr. Brian Czerniecki at University of Pennsylvania Hospital to treat my disability. I was forced to take a leave of absence for approximately five (5) months. When I returned to work, Dr. Katharine Garnier, Primary Care Physician, wrote me a note restricting the amount I walked. She requested that I work in Concourse B in order to do so.

III.   I gave this note to Naomi LNU, Human Resource Representative, but Respondent denied my request and continued to schedule me at the far end of Concourse C. This forced me to walk an unnecessary amount and exacerbated my disability. I complained to Christine Thompson, Manager, that I was not being accommodated. Ms. Thompson notified me that I would be accommodated, but the following day Larry Raikes, Supervisor, continued to assign me to the far end of Concourse C. I then complained to Beth Norton, Managing Director – Customer Care, in order to obtain my accommodation. However, Ms. Norton ignored my request. For approximately two (2) years, I requested an accommodation from Ms. Norton and other various individuals in management, but Respondent ignored my requests and continued to schedule me at the far end of Concourse C. I was forced to miss a substantial amount of time at work due to Respondent's failure to accommodate me.

IV.   On July 28, 2017, I sent an email to Mike Wilttie, Sr. Manager – Employee Relations/Operational

Support, Olympia Colasante, VP, PHL Hub Operations, Tricia Herschell, Managing Director Domestic & International HR Business Partners, and Robert Isom, President, complaining about Respondent's failure to accommodate me. Ms. Colasante stated that she would take care of it. The following day, Ms. Norton called me and informed me that Respondent would grant my accommodation request and assign me to work in Concourse B.

V.   On September 27, Joe Wilson, Manager, and Ms. Norton suspended me due to posts on my Facebook page. On October 6, 2017, Ms. Norton terminated me. Respondent's reason for terminating me was that I had identified myself as an employee of Respondent when I made my posts. I never identified myself as an employee of Respondent. However, Tom Doersom, Customer Service Supervisor, has a public Facebook with multiple posts calling President Donald Trump "Hitler, his supporters "Nazis", and "racist homophobic bigots." Mr. Doersom identifies himself as an employee of Respondent. Upon information and belief, Respondent has not disciplined or terminated Mr. Doersom for his posts.

VI.   I believe I was discriminated against due to my gender in violation of Title VII. I was also discriminated against due to my disability and denied a reasonable accommodation in violation of the ADA. I also believe I was retaliated against for complaining about Respondent's failure to accommodate me in violation of the ADA.

| | |
|---|---|
| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |
| 2·14·2018     *[signature]* | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (month, day, year) |
| Date          Charging Party Signature | |

# Attendance and performance guidelines for passenger service employees

**The following performance guidelines apply to all passenger service team members represented by the CWA-IBT.**

Effective September 12, 2016

# I. Introduction

When we think about one of the keys to our success as a Customer Experience department, we often think about dependability. Getting aircraft out on time is certainly one aspect of that, but behind the scenes, it also means having our full team at work, performing at their best every day, for every flight.

Knowing what's expected and having a clear understanding of what success looks like are integral parts of performing at our best. That's why we have attendance and performance guidelines for our U.S.-based passenger service employees represented by the CWA-IBT Association (including Puerto Rico).

The attendance piece is an objective, straightforward point system with a rolling active 12-month lookback period.

The performance piece also uses an active 12-month lookback, and allows for a review of each performance issue, the employee's work history and the opportunities for improvement.

These guidelines are just that - guidelines. They are not a contract of employment and may be to modified or removed at any time. If that's the case, we'll make sure employees are aware in advance.

## Separation of Attendance and Performance

Attendance and performance are generally separate and distinct. The attendance guiding principles apply only to attendance issues, which will be managed separately from job performance issues. Expectations for employee conduct and performance will be managed under the performance guidelines. However, there may be times when an issue involves both sets of guidelines. An example would be arriving late and not clocking in. The late arrival falls under attendance while the failure to clock would be addressed under performance.

# II. Application of Guidelines

The guidelines in this document apply only to those employees in the passenger service workgroup who have completed their probationary period pursuant to the applicable collective bargaining agreement.

They replace US Airways' Commitment to Success Attendance and Performance Program and American's Attendance Management Policy (AMP) and Peak Performance through Commitment with respect to passenger service employees employees.



EXHIBIT
Koslosky - 4
RC 5-7-19
PENGAD 800-631-6989

1

Attendance and performance guidelines for passenger service employees

# III.  Definition of Terms

**Absence(s) / Absent:** Any time an employee does not report or remain at work as scheduled. All Absences are considered chargeable attendance occurrences for assignment of points except those expressly identified as authorized leaves (see below), or those for which discipline may not be issued under applicable law.

**Active / Active Service:** The period(s) in which the employee is actively working, or receiving pay. Active / Active service excludes time periods when the employee is removed from payroll (e.g. unpaid leave of absence).

**Attendance Discussion(s) / Coaching:** Either a discussion during which the employee is advised of the company's attendance / performance expectations and the employee's status under the guidelines OR a notice provided to the employee that apprises the employee of his/her status under the company's attendance / performance expectations.

**Authorized Leave(s):** When acceptable documentation is submitted to the company, authorized leaves include: adoption, bereavement, family medical leave (FMLA), jury duty, maternity, medical (paid and / or unpaid for 14 or more calendar days from start of Absence), military, occupational injury, paternity, personal, and union leave.

**Chargeable Attendance Occurrence(s):** Absences or late arrivals that are assessed a point value according to the guidelines. A sick absence occurrence starts on the first day of absence and ends when the employee returns to work. Sick absences are assessed points based on each occurrence. Non-sick absences and late arrivals to work are daily occurrences and points are assessed daily regardless of the duration.

**Confirmation of Illness:** When the company is in doubt of a bona fide sick claim and / or the occurrence is for five (5) or more sick days (paid and / or unpaid), the Company may request an employee to provide documentation to substantiate that claim.

**Effective Period of Review Level / Discipline:** The rolling twelve (12) month period of active service commencing on the date the most recent Level is issued to an employee.

**Flex Late (for Airport, Premium Customer Services & Travel Center employees):** Up to two (2) times per calendar year the employee may start his or her shift up to fifteen (15) minutes late. Time is not made up, or paid. Flex lates are not chargeable attendance occurrences under the attendance guidelines.

**Late:** When an employee arrives to work no more than two (2) hours after the employee's shift start time (includes scheduled shifts, overtime and shift swaps) or at a time authorized by management.

**Late Notification (for an Absence):** When an employee notifies the company of the employee's absence after one (1) hour prior to the employee's shift start time, but less than two (2) hours following the employee's scheduled start time.

**Level(s):** There are three (3) levels of progressive review / discipline which will be applied in instances of unsatisfactory attendance or performance: Level 1, Level 2 and Level 3. Level 3 is a "Final Warning." If attendance / performance problems continue after Level 3 (Final Warning), an employee may be terminated.

**No Call / No Show:** When an employee does not report to work and does not notify the company of the absence within two (2) hours following the employee's scheduled start time.

**Point(s):** Assessed for each chargeable attendance occurrence (absence or late) to the extent permitted by any applicable law and as described in the attendance guidelines.

Attendance and performance guidelines for passenger service employees

**Progressive Review Level / Discipline:** When an employee fails to correct the employee's unsatisfactory attendance record or performance, the employee will be issued three (3) Levels of Progressive Review after which the employee may be terminated. Sometimes an employee's behavior or misconduct (performance) is sufficiently serious so that skipping levels, including moving directly to or termination, may be warranted.

**Sick Leave Abuse:** Utilization of sick leave, paid or unpaid, for any purpose other than an employee's personal illness or non-occupational injury (unless otherwise provided by law).

**Sick Leave Pay:** Pay protection for an absence when an employee is unable to report to work as scheduled due to the employee's own illness, notifies the company at least one (1) hour prior to the employee's scheduled start time, and the employee has accrued and available sick time.

**Termination:** Involuntary separation of employment.

# IV. ATTENDANCE GUIDELINES

## A. Employee Responsibilities

The company relies on its employees to report to work as scheduled. Employees are expected to report to work regularly and on time and remain in their assigned work area as necessary for the efficient performance of their work. We recognize that on occasion, illness or other compelling personal situations may require employees to be late or absent from work. Every employee has the responsibility to minimize absences to ensure dependable attendance. This includes: attending to personal obligations outside of work hours; not allowing minor indispositions or inconveniences to keep them away from work; allowing for variations in weather, traffic, or public transportation when commuting; not abusing sick leave; immediately notifying the company in the event of an absence; and following company procedures for securing authorized leaves of absence.

## B. Employee Obligations under the Attendance Guidelines

When an employee is going to be absent, the employee must notify the company at least one hour prior to the start of the employee's shift each and every day unless directed otherwise. An employee who fails to do so may be subject to a progressive review level. The employee must personally call to report an absence unless the employee is physically unable to do so.

## C. Point Assessment

The chart below identifies types of attendance occurrences and the number of points issued for each. The chart is not intended to be all-inclusive and cannot address all possible situations. Points issued may vary depending on individual circumstances.

| Occurrence | Points Per Occurrence |
| --- | --- |

3

Attendance and performance guidelines for passenger service employees

| | |
|---|---|
| Late | 0.5 Point |
| **Airports:** Absence with notification at least one (1) hour prior to scheduled shift start | 1.0 Point |
| **Reservations:** Absence with notification prior to shift start | |
| **Airports:** Absence with notification between 59 minutes prior to and two (2) hours after scheduled shift start | 1.5 Points |
| **Reservations:** Absence with notification between scheduled shift start and two (2) hours after scheduled shift start | |
| Absence for five (5) or more consecutive days without Company approved documentation | 2.0 Points |
| Absence associated with a communicated pattern (e.g. holiday, calendar, conjunctive) | 2.0 Points |
| No Call / No Show - either no notification or more than two (2) hours after scheduled shift start | 2.5 Points |
| No Call / No Show for 3 consecutive scheduled work days | Termination |

A sick absence that covers one or more consecutive scheduled work days is one (1) occurrence under the guidelines. For these absences, points are assessed per occurrence. A sick absence ends when the employee returns to work.

A non-sick absence and late arrival are daily occurrences and are assessed points on a daily basis.

# D. Flex Late Guidelines for Airport, Premium Customer Services & Travel Center Employees

Employees may start their shift up to fifteen (15) minutes late up to two (2) times per calendar year. The time will not be made up, or paid. The two (2) Flex lates are not chargeable attendance occurrences under these guidelines.

# E. Procedure

The company will track chargeable attendance occurrences and their cumulative point total over the previous 12-month period of active service starting from the first day of absence associated with the most recent attendance occurrence to determine if a progressive review level is warranted. Once a level has been issued,

Attendance and performance guidelines for passenger service employees

attendance is reviewed during the effective period of review level, which is 12 months of active service starting on the date a level is issued to the employee.

Examples of ways in which employees will be assigned points for attendance absences and lates follow. These are only examples and the list is not intended to be all-inclusive:

- Calling in absent for a scheduled work day, including shift trades and overtime
- Reporting late for duty, including shift trades and overtime
- Leaving work before the end of shift
- Missing work assignment as a result of not having all required items

**Authorized Leaves** are not counted as points and are not subject to progressive review levels when acceptable documentation is submitted to the company. Authorized leaves include: adoption, bereavement, family medical leave (FMLA), jury duty, maternity, medical (paid and / or unpaid for 14 or more calendar days from start of absence), military, occupational injury, paternity, personal, and union leave.

# F. Progressive Review Levels

The chart below outlines the guidelines for levels based on points assigned. The guidelines are not intended to be all-inclusive and cannot identify all possible situations. Levels issued for an infraction may vary from the stated guideline based on individual circumstances and/or applicable laws.

| Point Total | Progressive Review Levels |
| --- | --- |
| Less than 4 Points within 12-month period of Active Service (prior to and including the 1st date of last occurrence) | Coaching |
| 4 Points within 12-month period of Active Service (prior to and including the 1st date of last occurrence) | Level 1 |
| 3 Points within the Level 1 Effective Period (12-month period of Active Service) | Level 2 |
| 2 Points within the Level II Effective Period (12-month period of Active Service) | Level 3 |
| 2 Points within the Level III Effective Period (12-month period of Active Service) | Termination |

# EXAMPLES

**Example 1:** Agent Jane calls out sick for 3 days beginning on September 27, 2016 and receives one (1) point. To determine whether this occurrence triggers a progressive review level, the supervisor / manager reviews the 12-month active service period prior to the occurrence. In this instance, the 12-month active service period is from September 28, 2015 through September 27, 2016. In the event Jane was on a five-month leave of absence during this 12-month period, the supervisor / manager would need to look back an additional five (5)

Attendance and performance guidelines for passenger service employees

months, totaling a seventeen (17) month period which would result in a 12-month active service period from April 28, 2015 through September 27, 2016. At this time, Jane's cumulative point total for the 12-month period of active service is three point five (3.5) points and therefore this occurrence does not trigger a level.

**Example 2:** Agent Jane calls out sick for one day and receives one (1) point on October 24, 2016. At this time, Jane's cumulative point total for the 12-month period of active service is four point five (4.5) points. Based on her cumulative point total, this attendance occurrence triggers a progressive review level. Her supervisor / manager issues her a level 1 on November 1, 2016. The effective period is from November 1, 2016 through October 31, 2017 assuming Jane remains Active (on payroll) from the date the level 1 is issued through October 31, 2017.

**Example 3:** Agent Jane is late for work on November 16, 2016 and receives a half a point (0.5) for this chargeable occurrence. At this time, Jane's cumulative point total for the effective period for the level 1 is half (0.5) a point, therefore this occurrence does not trigger an escalation in Level.

**Example 4:** On October 29, 2017 Jane calls absent for work due to personal reasons and advises the company 10 minutes before her shift start time. She receives one and one half (1.5) points for this chargeable occurrence since she was late in notifying the company of her Absence. On the following day, October 30, 2017, Jane calls absent for work again for personal reasons but this time advises the company an hour and a half before her shift start time. She receives one (1.0) point for this chargeable occurrence. At this time, Jane's cumulative point total for the effective period for the level 1 is three (3.0) points. This triggers the next level. Her supervisor / manager issues her a level 2 on November 8, 2017. The effective period for this level 2 is from November 8, 2017 through November 7, 2018, assuming Jane is active during this time period.

**Example 5:** On January 11, 2018, Jane does not come to work nor does she call in her absence. She receives two and one half (2.5) points for this chargeable no call / no show occurrence. Jane's cumulative point total for the effective period for the level 2 triggers an escalation to the next level. Her supervisor / manager issues her a level 3 on January 18, 2018. The effective period for this level 3 is from January 18, 2018 through January 17, 2019, assuming Jane is active during this time period.

**Example 6:** On January 17, 2019, since Jane has not had any chargeable attendance occurrences OR she has not accumulated two (2.0) or more points during the effective period for the level 3, the level 3 expires.

# G.  Verification of Sick Absence

Pursuant to the collective bargaining agreement, employees may be required to present confirmation of illness. The company reserves the right to require, when in doubt of a bona fide claim, acceptable documentation to confirm such sick claim. In the event the requested documentation is not supplied, or such documentation is incomplete or does not substantiate the employee's illness or injury, the absence may be considered sick leave abuse and the employee may be subject to a progressive review level up to and including termination.

The following are examples of when the company may be in doubt of a bona fide sick claim and require acceptable documentation. These are examples and not intended to be all inclusive.

- Absences while on a level under the attendance guidelines.
- Absence occurrences of 5 or more consecutive work days
- Absences within any of the following periods:
  - December 20 through January 6
  - Super Bowl Sunday through the Monday after
  - The Friday preceding Easter through the Monday following Easter.
  - Memorial Day weekend (including Memorial Day)

Attendance and performance guidelines for passenger service employees

- • July 1 through July 7
- • Labor Day weekend (including Labor Day)
- • October 31
- • The Tuesday before Thanksgiving through the following Sunday
- • An annual absence pattern
- • Absences immediately preceding or following a vacation day, a day off or swap off
- • When the employee is notified in advance of the requirement to provide confirmation of illness for future absences due to a suspicion of sick leave abuse

When documentation is required, as described above, for a non-FMLA qualifying occurrence, the employee must submit the documentation to the company on the first day the employee returns to work, if the company has advised the employee of this requirement in advance. If the company notifies the employee that documentation is required after the employee returns to work, the documentation must be submitted to the company within seven (7) calendar days of notification.

The required sick verification documentation is available on Jetnet and needs to be completed by the employee's healthcare provider and returned to the company's Absence and Return Center (ARC).

## H. Sick Leave

Passenger service employees may only use their sick leave for their own personal illness or injury, unless otherwise permitted by a contractual provision or mandated by law.

# V. PERFORMANCE PROGRAM

## A. Professional Conduct

Building the world's greatest airline means having all of our team members consistently do their part to ensure that we consistently provide exceptional service to our customers. Though the roles and responsibilities of each team member vary, one thing remains constant: we all need to be professional both in our behavior and performance.

Fundamentally, all employees should show commonsense, integrity, responsibility, initiative and good judgment at all times. That means being the best employee, which positively reflects on our company and colleagues. And, while we recognize that for most of us, these expectations are all we need to know. For those who prefer specifics, we have outlined specific expectations in our Professional Conduct Standards.

Attendance and performance guidelines for passenger service employees

# B. Professional Conduct Standards for Passenger Service Employees

American Airlines employees are expected to demonstrate professional conduct that reflects commonsense, integrity, responsibility, initiative, efficiency and good judgment at all times. Employees should not act in a way that is detrimental to the welfare of, or reflects unfavorably on, the company or its employees. By way of example only, the following types of conduct are prohibited and may result in discipline up to and including termination:

- Misrepresentation of facts or falsification of records (including, for example, training records, employment applications, pay records, etc.) for any reason including to obtain travel passes, employee benefits, pay for the employee or a coworker, or other privileges.
- Submitting incorrect timesheets or other time records, or allowing incorrect timesheets or other time records to be submitted. Please note that this applies to both your own timesheets or time records, and those of others.
- Working unauthorized overtime (the company will pay employees for all time worked regardless of whether it was authorized, but working without authorization may be treated as a disciplinary matter).
- Intentional work slow-downs, encouraging work slow-downs, or intentional restriction of output, productivity or workmanship.
- Loafing, sleeping on the job, or "nesting."
- Insubordination, or willful refusal or failure to follow a direction from management or refusal to perform assigned work.
- Failure to report any injury, accident, dangerous, unsafe or hazardous situation or condition to a member of management as soon as possible, or failure to follow all posted and/or published safety rules or any other disregard for safety.
- Unauthorized use of property or information owned or maintained by the company, its employees, or vendors, including, as example only, information and data related to our customers and employees, equipment, and electronic assets.
- Selling goods or services to the company or other employees while at work or using company property, information or assets for personal gain.
- Soliciting, collecting, or accepting contributions from coworkers on company time without company authorization.
- Utilizing audio recording or video-taping equipment (for example, the use of camera / video features on cell phones or glasses) on company property or while on duty, except where such equipment is provided by the company and then only in performing duties assigned by the company, unless the company provides prior written approval.
- Certain criminal offenses, whether committed on duty or off duty.
- Any failure to follow TSA or FAA regulations, or any applicable security regulations.
- Pilferage, theft, or attempted theft.
- Violence, physical assault, or horseplay on company premises at any time or while on duty
- While at any company workplace, or performing duties on behalf of the company, using any weapons, firearms or explosive devices, or knowingly permitting another employee to possess or use the foregoing, unless authorized by the company.
- Failure to abide by the company's Equal Employment / Non-Harassment policy.
- Participation in any effort, including those offsite, that may constitute support of a potentially dangerous or disruptive effort against the airline and / or our employees.
- False or slanderous statements about the company, its employees, its vendors or patrons.
- Any violation of drug and alcohol policies.
- Use of inappropriate language.
- Gambling on company premises or while on duty.
- Failing to check in or off duty in the prescribed manner.

Attendance and performance guidelines for passenger service employees

- Clocking in or out for others.
- Failure to safeguard corporate resources or property of others, including the destruction defacing or damaging of airport or company property.
- Assisting any person in gaining unauthorized entrance to, or exit from American Airlines facilities or offices, including airport property.
- Solicitation and / or acceptance of gratuities (tips) of any kind from customers, vendors or visitors, unless specifically approved by your manager and Human Resources.

The above list is not all-inclusive and cannot address all possible situations or every practice or principle related to honest and ethical conduct. Unprofessional conduct will be dealt with according to the seriousness of the offense, and violators will be subject to appropriate disciplinary action up to and including termination. Generally, if conduct does not meet these expectations, your management team will work with you to address the issue through the use of a progressive counseling process. The process may include a non-disciplinary coaching discussion, a Level 1, Level 2, Level 3, or termination of employment. Some behavior, even if committed for the first time, may be serious enough standing alone to warrant termination or other discipline, even in the absence of prior discipline.

If you have any questions about the Professional Conduct Standards, please reach out to your supervisor / manager.

## C.  Review of Facts and Action

We will conduct a review of facts prior to the application of any discipline, including discharge. Depending upon the circumstances, an employee may be suspended while we gather the necessary details. And, the following may be considered as part of the review and in the determination of what discipline, if any, is warranted:

- The nature and seriousness of the offense
- The duration of the problem
- The number of attempts to counsel you regarding your previous performance infractions
- Your work history
- Your general behavior and willingness to improve

We will track performance over a 12-month period of active service (as defined in the attendance guidelines) leading up to the performance issue. Once a disciplinary step has been issued, the discipline will remain active for a period of 12 months of active service ("effective period"). If additional progressive discipline is necessary during that 12-month period, all discipline will remain effective until 12 months following the most recent step of the progressive discipline.

## D.  EAP

The Employee Assistance Program (EAP) is separate from one's professional conduct. If an employee has committed an offense warranting discipline, the discipline should be administered, even if the employee seeks assistance through the EAP. Though we encourage all employees to utilize the EAP's services, discipline is not to be waived solely because an employee is seeking help for an addiction or other problem.

MENU

All Places > Resources > Documents

**POLICY**

# Overview of social media policy

Created by Adib Abrahim on Oct 29, 2016 1:28 PM          3   minute read

American Airlines recognizes the importance of social media. To the extent an individual chooses to engage in social media activities, it is important for everyone to remember that what is said or done in various social media channels (websites, blogs, micro-blogs, wikis, social networks, etc.) may reflect directly on the individual's character, reputation and integrity as well as that of an individual's friends, associates and colleagues.

"Social media activities" may occur in a wide variety of contexts, including websites such as LinkedIn, Facebook, Twitter, YouTube, and MySpace. Other online venues for social media activities include blogs, online discussion forums or traditional media websites that permit visitors to interact by posting comments. Such online venues may be dedicated to particular interests, e.g. travel, alumni organizations or professional organizations.

This policy applies to all types of social media activity, including:
(a) activity that uses Company computers, mobile devices, or other equipment or technology;
(b) activity that uses non-Company technology when linked to the Company's systems; and
(c) activity that is engaged in on or off duty which is subject to the Company's Rules of Conduct and other Company policies and guidelines (referenced below).

Prior to posting anything online, remember you are personally responsible for the content you post or publish in any form of user-generated media. To the extent any of your personal or business related postings refer to, relate to, implicate or reflect on American Airlines or any other AAG company, you will be held responsible for complying with any American Airlines' rules, policies and procedures that may relate to your post.

The same policies and guidelines that apply to American Airlines employee activities on or off duty apply to American Airlines employee activities online. "American Airlines employee activities" include, but are not limited to, the activities of: an individual employee or group of employees acting on their own behalf; a company department, business unit, or station; and a Company-sponsored employee group or clubs.

1728 Views     Categories:     Tags: policy, twitter, facebook, social media, social media policy

EXHIBIT
Koslosky- 5
RC 5-7-19
PENGAD 800-631-6989

AMERICAN 000005

 ¹                                        MENU

All Places › Policies › Domestic U.S. policies › Documents

**POLICY**

# Work environment

Created by Policy Admin on Nov 22, 2016 3:48 PM                    9 minute read

These guidelines apply to regular domestic U.S. employees.  Internationally based employees should refer to the    policies for their region.

Together, we have the opportunity to create a safe and inviting place to work, a workplace that sets us apart. Here's what will get us there.

## Embrace diversity

We're a global airline, made up of a diverse workforce. We should celebrate our differences, and nothing less. We will not tolerate discrimination, unlawful harassment, bias-related behavior, threats of workplace violence, or other inappropriate behavior. Respecting one another is a core value of our culture.

American strictly prohibits harassment and discrimination because of regard to race, color, religion, gender, pregnancy, gender identity, gender expression, sexual orientation, national origin, ethnic origin, citizenship, age, protected veteran status, genetic information, disability or any category protected by law.

You play a role in creating a workplace that is free from such discrimination and/or harassment. We're all accountable – including our leaders. Types of unacceptable behavior in the workplace may take a variety of forms, including verbal, physical, and visual contact, threats, demands, and retaliation for making a complaint. Examples may include, but are not limited to:

- Bias-related behavior – behavior that suggests hatred for, or hostility toward, a person or group because of their race, sex, sexual orientation, gender identity, religion, or protected characteristic. This may include, but is not limited to, bigoted slurs, drawings, and symbols such as a hangman's noose, a swastika, or graffiti.

- Verbal conduct, such as epithets, demeaning or derogatory comments, jokes, negative stereotyping, slurs or any term or code name that denigrates or disparages others, including but not limited to any member of a minority, racial, or ethnic group.

AMERICAN 000006

- Physical conduct such as assault, unwelcome touching, blocking normal movement, interfering with work, threatening, intimidating, or offensive behavior that relates to the factors described above.

- Visual conduct such as derogatory or otherwise offensive posters, cards, objects, symbols, calendars, photographs, cartoons, graffiti, drawings, jokes, letters, e-mail, or gestures that denigrate or show hostility toward an individual or group.

  This applies to us all, including anyone working on behalf of the company. If you see it happening, report it to your manager, contact Human Resources or call the EthicsPoint Helpline (877) 422-3844. You can also find out more at www.aa.ethicspoint.com.

If you violate, engage in, or condone this kind of behavior, or retaliate against an employee who reports this kind of behavior, you will be subject to appropriate disciplinary action, up to and including termination.

# Free of discrimination

We can't stress it enough. American does not tolerate discrimination or harassment, or retaliation for making a complaint of discrimination or harassment, or participating in an investigation of such a complaint. If you feel that you have been harassed, or discriminated or retaliated against in the employment or accommodation process, report it to your manager,    HR Business Partner and/or the EthicsPoint Helpline. Your complaint will be investigated, appropriate corrective action will be taken to stop any appropriate conduct and prevent it, and there will be no reprisals for making such reports in good faith or participating in an investigation of such a complaint. Remember, it is everyone's job to report discrimination and harassment and to cooperate in the company's investigation of such reports. Anyone found engaging in discrimination, harassment or retaliation will be subject to discipline, up to and including termination.

# Keep it fair

No one wants to work for a company where harassment, intimidation or violence lives. To be absolutely clear, American prohibits threats and workplace violence toward our employees, vendors, customers or property. In no shape or form will the following be tolerated:

- Physically or verbally threatening or intimidating another individual while at work, including acts of bullying;

- The intentional destruction or threat of destruction of company or another's property;

- Harassing or threatening an employee while at work, including phone calls or written communications;

- Stalking at work; and

- Advocating illegal use of firearms, bombs, or weapons while at work.

This applies to everyone working on behalf of the company, including, but not limited to, American employees, contract workers, temporary workers, and non-employees on American's property. If you

AMERICAN 000007

witness or are aware of any violent or potentially violent conduct. do the right thing and report it to your local management as quickly as possible. They'll take it from there, making an initial assessment of the situation and contacting Human Resources.

# No sexual harassment

American Airlines is committed to fostering a work environment that is free from sexual harassment, and that includes retaliation for raising a sexual harassment complaint or cooperating in an investigation.

The Equal Employment opportunity commission defines sexual harassment as unwelcome sexual advances. requests for sexual favors and other verbal. or physical conduct of a sexual nature when:

- Submission to such conduct by an individual is made explicitly or implicitly a term or condition of employment;

- Submission to. or rejection of, such conduct by an individual is used as a basis for an employment decision; and/or

- Such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating hostile or offensive work environment.

- Examples of sexual harassment may include:

- Making or threatening retaliation after a negative response to sexual advances;

- Offering employment benefits in exchange for sexual favors;

- Visual conduct – leering, making sexual gestures, displaying of sexually suggestive objects, pictures, cartoons, or posters;

- Verbal conduct – making or using derogatory comments, epithets, slurs, sexually explicit jokes, sexual innuendoes, comments about an employee's body or dress;

- Verbal sexual advances or propositions;

- Verbal abuse of a sexual nature. graphic verbal commentary about an individual's body, sexually degrading words to describe an individual. suggestive or obscene letters, notes, or invitations; and

- Physical conduct – unwelcome touching or massages, assault. impeding. or blocking movements.

If you are offended by inappropriate conduct in the workplace. and if comfortable in doing so, tell the alleged harasser you are offended by the behavior and/or remarks and you want it to stop. Do not ignore the behavior. If the behavior continues, or you do not feel comfortable talking to the alleged harasser about it, immediately report the behavior to your manager, your local HR Office/HR manager or the EthicsPoint Helpline at (877) 422-3844 or www.aa.ethicspoint.com.

Sexual harassment complaints will be investigated by the company with due regard for privacy and confidentiality of all persons involved. The company will take prompt and appropriate corrective action to stop any harassment or inappropriate conduct and prevent its recurrence. As

AMERICAN 000008

circumstances warrant. the harasser may be subject to discipline. up to and including termination.
Employees must cooperate with the Company in its investigation of harassment and discrimination MENU
complaints. There will be no retaliation against an employee who. in good faith, raises concerns or
makes complaints of alleged. perceived or actual unlawful harassment or discrimination. or who
cooperates in the investigation of such matters.

3887 Views        Categories:        Tags: diversity. discrimination. work environment. harassment

Average User Rating

(0 ratings)

© 2017 American Airlines. Inc  All Rights Reserved

AMERICAN 000009

 American Airlines

### REASONABLE ACCOMMODATION REQUEST — HEALTH CARE PROVIDER

**Instructions: Employee should complete Sections 1 and 6. In addition, please ask your health care provider to complete Sections 2- 5. Please attach your job description to the request form**

**SECTION 1 — EMPLOYEE INFORMATION**

| Name _COllEEN KoSlosky_ | Employee Number _457648_ | Home Telephone |
| Address _110 WHitman Ave_ | City _STRATFORD_ | State _NJ_ | Zip _08084_ |
| Department _CS_ | City _PHL_ | Supervisor _TY NORTHERN_ | Work Telephone |
| Current Position _CSA_ | | | |

**Employee Certification and Medical Release**

I hereby authorize a health care provider representing American Airline to contact the undersigned health care provider for purposes of making disability related inquiries such as whether I have a disability, the need for any reasonable accommodation, and the nature of any such accommodation.

_____              _____
Employee's Signature                                                      Date

**SECTION 2 — DETAILS OF EMPLOYEE'S CONDITION**

The employee identified above has requested a job accommodation from American Airlines. In order for the Company to properly evaluate the request, the following information is requested to help determine whether the employee has a disability.

Does the employee have a physical or mental impairment? ☐ Yes   ☐ No

If yes, what is the impairment? _EDEMA DUE TO CANCER SURGERY_

What is the duration of the employee's impairment? _INDEFINATE_

Does the impairment affect any of the following:
(Check any that apply)

| | | | |
|---|---|---|---|
| ☐ Caring for Self | ☑ Walking | ☐ Hearing | ☐ Lifting |
| ☐ Interacting with Others | ☐ Standing | ☐ Seeing | ☐ Sleeping |
| ☐ Performing Manual Tasks | ☐ Reaching | ☐ Speaking | ☐ Concentrating |
| ☐ Breathing | ☐ Thinking | ☐ Learning | ☐ Operation of Bodily Function |
| ☐ Working | ☐ Sitting | ☐ Eating | ☐ Reacting |
| ☐ Bending | ☐ Reading | | |
| ☑ Other _HEAT And EXCESSIVE WAlKing._ | | | |
| ☐ None of the above | | | |

Does the impairment substantially limit the ability of the employee to perform any of the activities you identified as compared to most people in the general population? ☑ Yes

12433_healthcare_provider.pdf                    Page 1 of 2                              05/11/2016



EXHIBIT
PENGAD 800-631-6989
_Koslosky - 6_
_RC 5-7-19_

AMERICAN 000592

**REASONABLE ACCOMMODATION REQUEST — HEALTH CARE PROVIDER**

**SECTION 3 – QUESTIONS TO HELP DETERMINE WHETHER AN ACCOMMODATION IS NEEDED**

Please see the attached job description to complete this Section.

What limitation(s), if any, interfere with the job performance or the employee's ability to access an employment benefit?

*EXCESSIVE WALKING And HEAT*

How do the employee's limitation(s) interfere with his/her ability to perform the job function(s) or access an employment benefit?

*NO.*

**SECTION 4 – QUESTIONS TO HELP DETERMINE EFFECTIVE ACCOMMODATION OPTIONS**

Do you have any suggestions regarding possible accommodations to enable the employee to successfully perform his/her job or access an employment benefit? If so, what are they?

*YES - PATIENT HAS REQUESTED TO STAY ON B - CONCOURSE AS MUCH COOLER And LESS WALKING. ALSO, PATIENT HAS A PLACE ON B WHERE SHE CAN SIT And ELEVATE LEG AND IS VERY COOL.*

Would performing any of the job functions result in a direct safety or health threat to this employee or other people? Is there any other accommodation you would recommend which would eliminate this threat?

*NO*

**SECTION 5 – TREATING HEALTHCARE PROVIDER INFORMATION**

Health Care Provider's Name (Print) *Dr. KATHERINE GWENN*

Today's Date *8/11/2015*   Type of Practice _____   State (location) of Practice *NJ*

Other Phone Number *856-561-7020*   Office Fax _____

Treating Health Care Provider's Signature _____

**SECTION 6 – EMPLOYEE'S CERTIFICATION**

I CERTIFY THAT ALL STATEMENTS AND ANSWERS PROVIDED BY ME OR MY HEALTH CARE PROVIDER ON THIS FORM ARE COMPLETE AND TRUE TO THE BEST OF MY KNOWLEDGE, AND I UNDERSTAND THAT ANY FALSIFICATION OF MY MEDICAL HISTORY OR REQUEST MAY BE CAUSE FOR DISCIPLINARY ACTION UP TO AND INCLUDING TERMINATION.

Employee's Signature *Uhm Kosovoly*   Date *8/11/2015*

Please give completed form to your Human Resources Business Partner

AMERICAN 000593

**American Airlines**

## REASONABLE ACCOMMODATION REQUEST FORM

| SECTION 1 - EMPLOYEE INFORMATION | | |
|---|---|---|
| Employee Name COLLEEN KOSLOSKI | Employee Number 404148 | Today's Date |
| Manager Name Ty Northern | Employee Conta | ☐ (include city & state) PHL |
| Work Group /CS | | |

| | | |
|---|---|---|
| ☒ Fleet Service (Ramp, Cargo, etc.) | ☐ Flt. Ops Other (FCTI, Sim Engineer, Dispatch, etc.) | ☒ Passenger Service - Airports |
| ☐ Flight Attendants | ☐ Maintenance | ☐ Pilot |
| ☐ Flt. Ops Pilot | ☐ Non-contract (Mgt., Admin.) | ☐ Reservations |
| Employee Mailing Address | | Employee Email Address |

| SECTION 2 – QUESTIONS TO CLARIFY ACCOMMODATION REQUESTED | |
|---|---|
| Accommodation Start Date Immediately | Accommodation End Date (Indicate "indefinite" if requesting an indefinite modification.) INDEFINITE |

**A.     Questions To Clarify Accommodation Requested.**

What specific accommodation are you requesting?

TO BE ASSIGNED TO B-GATES ONLY. EDEMA IS EFFECTED BY HEAT (C-GATES VERY HOT) AND EXCESSIVE WALKING. ALSO ON B, THERE IS A PLACE I CAN GO TO TO ELEVATE LEG, AND IS VERY COLD TO BRING SWELLING DOWN.

If you are not sure what accommodation is needed, do you have any suggestions about what options we can explore?        ☐ Yes    ☒ No

If yes, please explain.

Is your accommodation request time sensitive?        ☒ Yes    ☐ No

If yes, please explain.

DUE TO EXCESSIVE SWELLING OF SURGERY SITE.

**B.     Questions To Document The Reason For Accommodation Request.**

What, if any, job function are you having difficulty performing?

I HAVE BEEN ASSIGNED TO BE TERMINAL, HOWEVER SINCE COMING BACK, NOW I HAVE BEEN ASSIGNED C-35, C32, C30, WHICH ARE EXTREMELY HOT AND VERY LARGE WALKS.

Have you had any accommodations in the past for this same limitation?    ☐ Yes    ☒ No

If yes, what were they and how effective were they?

AMERICAN 000594

**REASONABLE ACCOMMODATION REQUEST FORM**

If you are requesting a specific accommodation, how will that accommodation assist you?

LESS WALKING, LESS EXCESSIVE HEAT EXPOSURE, AS THAT
IS A MAJOR CONTRIBUTING FACTOR WITH EDEMA.

Other:   Please Provide Any Additional Information That Might Be Useful In Processing Your Accommodation Request.

**SECTION 3 – IMPORTANT INFORMATION**

American Airlines  will review and respond to your job accommodation request as soon as feasible.  If you have questions in the meantime, please contact your Human Resources Business Partner.

**SECTION 4 – SIGNATURES**

I certify that all statements and answers provided on this form are complete and true to the best of my knowledge, and I understand that any falsification of my medical history or request may be cause for disciplinary action up to and including termination.

| Employee Signature | Date 8/15/16 |
| --- | --- |

Send completed form to your Human Resources Business Partner

**SECTION 5 – INTERNAL USE ONLY**

Date Received

| Forwarded to (Name) | Date |
| --- | --- |

AMERICAN 000595



August 22, 2016

Ms. Colleen Koslosky
110 Whitman Ave
Stratford, NJ 08084

**BY MAIL**

Dear Colleen:

You submitted a request for a reasonable accommodation under the Americans with Disabilities Act (ADA) on August 16, 2016. Specifically, you requested to remain on B-Concourse as you felt it was much cooler and there is less walking as you have a place on B where you can go and elevate your foot.

On August 16, 2016, you and I had an interactive discussion to explore possible reasonable accommodations. At that time, I did advise that I would then engage with the Customer Care department director to review your request and explore options.

After a review of all the information available, the Customer Care operation is unable to fulfill your request. With regards to the temperature, please note that any facility issue would have to be reviewed by Beth Norton and the DOA. You are certainly welcome to bid and hold a ticket counter if this suits your needs. However, the operation cannot assign any particular agent a concourse. Please utilize the break rooms available to you on your assigned breaks to elevate your foot if need be.

Please let me know if you have any questions or future concerns.

Sincerely,

Naomi Postlewait
Senior HR Specialist, Human Resources
Philadelphia International Airport
610-362-4126

**EXHIBIT**

Koslosky-7
PENGAD 800-631-6989
EC 5-7-19

AMERICAN 000610

Jul.18.2017  07:23 PM                                PAGE.  1/ 2

610-362-7261

**American Airlines**

### REASONABLE ACCOMMODATION REQUEST — HEALTH CARE PROVIDER

**Instructions:  Employee should complete Sections 1 and 6.  In addition, please ask your health care provider to complete Sections 2- 5.  Please attach your job description to the request form**

SECTION 1 – EMPLOYEE INFORMATION

Name _Colleen Koslosky_   Employee Number _AV7648_   Home Telephone _____

Address _110 Whitman Ave._  City _Stratford_  State _NJ_  Zip _08084_

Department _____  City _PHL_  Supervisor _Multiple_  Work Telephone _____

Current Position _Customer Service_

**Employee Certification and Medical Release**

I hereby authorize a health care provider representing American Airline to contact the undersigned health care provider for purposes of making disability related inquiries such as whether I have a disability, the need for any reasonable accommodation, and the nature of any such accommodation.

_Colleen Koslosky_                                    _7/18/17_
Employee's signature                                   Date

### SECTION 2 – DETAILS OF EMPLOYEE'S CONDITION

The employee identified above has requested a job accommodation from American Airlines.  In order for the Company to properly evaluate the request, the following information is requested to help determine whether the employee has a disability.

Does the employee have a physical or mental impairment?  ☒ Yes  ☐ No

If yes, what is the impairment? _RLE Lymphedema, RLE nerve damage, gait dysfunction_

What is the duration of the employee's impairment? _to be determined_

Does the impairment affect any of the following:
(Check any that apply)

| | | | |
|---|---|---|---|
| ☐ Caring for Self | ☒ Walking | ☐ Hearing | ☐ Lifting |
| ☐ Interacting with Others | ☐ Standing | ☐ Seeing | ☐ Sleeping |
| ☐ Performing Manual Tasks | ☐ Reaching | ☐ Speaking | ☐ Concentrating |
| ☐ Breathing | ☐ Thinking | ☐ Learning | ☐ Operation of Bodily Function |
| ☐ Working | ☐ Sitting | ☐ Eating | ☐ Reacting |
| ☐ Bending | ☐ Reading | | |

☐ Other_____
☐ None of the above

Does the impairment substantially limit the ability of the employee to perform any of the activities you identified as compared to most people in the general population? ☒ Yes    No

12433_healthcare_provider.pdf          Page 1 of 2                    05/11/2015

_Clock-In @ B-5 underneath  (b-15 or b-1 right thru)_

EXHIBIT
Koslosky-8
RC 5-7-19
PENGAD 800-631-6989

AMERICAN 000596

## REASONABLE ACCOMMODATION REQUEST – HEALTH CARE PROVIDER

**SECTION 3 – QUESTIONS TO HELP DETERMINE WHETHER AN ACCOMMODATION IS NEEDED**

Please see the attached job description to complete this Section.

What limitation(s), if any, interfere with the job performance or the employee's ability to access an employment benefit?

Pt. had melanoma flap surgery to R. LE which has since caused RLE edema and nerve damage. The pain caused by current condition is continuous in nature.

How do the employee's limitation(s) interfere with his/her ability to perform the job function(s) or access an employment benefit?

Pt. has physical limits of long distance walking and experiences pain w/ repetitive walking. Also experienced pain in RLE in elevated temperatures.

**SECTION 4 – QUESTIONS TO HELP DETERMINE EFFECTIVE ACCOMMODATION OPTIONS**

Do you have any suggestions regarding possible accommodations to enable the employee to successfully perform his/her job or access an employment benefit? If so, what are they?

Limit long distance walking and exposure to elevated temperatures > 85°F.

Would performing any of the job functions result in a direct safety or health threat to this employee or other people? Is there any other accommodation you would recommend which would eliminate this threat?

Yes. Pt has favored left lower extremity causing skeletal misalignment that puts at a higher risk for falls + gait abnormality.

**SECTION 5 – TREATING HEALTHCARE PROVIDER INFORMATION**

Health Care Provider's Name (Print) Dr. Patricia O'Brien

Today's Date 7-18-17 Type of Practice Chiropractic State (location) of Practice Stratford, NJ

Other Phone Number 856 782-7800 Office Fax 856 782-0075

Treating Health Care Provider's Signature Dr. Patricia O'Brien

**SECTION 6 – EMPLOYEE'S CERTIFICATION**

I CERTIFY THAT ALL STATEMENTS AND ANSWERS PROVIDED BY ME OR MY HEALTH CARE PROVIDER ON THIS FORM ARE COMPLETE AND TRUE TO THE BEST OF MY KNOWLEDGE, AND I UNDERSTAND THAT ANY FALSIFICATION OF MY MEDICAL HISTORY OR REQUEST MAY BE CAUSE FOR DISCIPLINARY ACTION UP TO AND INCLUDING TERMINATION.

Employee's Signature [signature] Date 7/18/17

Please give completed form to your Human Resources Business Partner

**From:** Yori, Robert <Robert.Yori@aa.com>
**Sent:** Wednesday, July 26, 2017 1:17 PM
**To:** colleenkoslosky@hotmail.com
**Subject:** ADA Accommodation
**Attachments:** Koslosky, Colleen ADA AccommodationLtr 07-25-17.pdf

**Follow Up Flag:** Follow up
**Flag Status:** Flagged

Dear Colleen:

It was good talking with you today.

Please find attached your letter of accommodation.  As I mentioned, the next CWA bid will probably be announced in August and be posted sometime in September 2017.  In order to expedite your return to work, we can temporarily assign you in POC until such time that the bid is posted.  Thereafter, with your seniority, you can bid and hold any of the accommodation assignments indicated in the letter.  Your operations management has committed to making certain that you will be provided relevant training in any of the accommodations.

I know that were clear with me that you did not intend to avail yourself to the accommodations provided.  Rather, you said that you would attempt to swap assignments with other agents in order for you to work on Concourse B.  Nevertheless, I am requesting that you consider the accommodations provided in this letter.

I will call you again on Friday, July 28, so that we can review any questions or concerns you have.

Kind regards,
Bob

**American Airlines**

*Bob Yori*
Human Resources
Off:  610.362.1990
Fax:  610.362.7261



1

AMERICAN 000608

**American Airlines**

July 25, 2017

Ms. Colleen Koslosky
110 Whitman Ave.
Stratford, NJ 08084

**VIA EMAIL**: colleenkosloski@hotmail.com

Dear Ms. Koslosky:

This letter is a follow-up to our interactive discussions, the most recent of which occurred today.

On July 18, 2017, you submitted a Reasonable Accommodation Request form requesting an accommodation in order to perform the essential functions of your Customer Service Agent position at the Philadelphia International Airport.

Your requested accommodation, and supported by your Health Care Provider, was to limit long your distance walking and exposure to elevated temperatures greater than 85 degrees Fahrenheit.

During one of our interactive discussions, you suggested to be assigned only to Concourse B as an accommodation. You said that normally clock-in under the B-5 gate and that you were able to walk and work any gate from B-1 to B-15. You further stated that you surmised that a personality conflict between your union scheduler and you was a possible reason for you being assigned to gates on concourses that required long distance walking beyond your requested accommodation.

After evaluation, we are unable to accommodate you by assigning you only to work B concourse. This is due to the required flexibility our operation needs to assign agents to whatever concourse and gates are in need of staffing as a result of often spontaneous gate changes, diversions and irregular operations.

However, in reviewing your seniority, we have confirmed that you will be able to bid and hold (under your Collective Bargaining Agreement) other locations that are suitable accommodations. Such locations include the B/C Ticket Counter or POC or Special Services. Both the Ticket Counter and POC are closer than the furthermost gates on Concourse B. Special Services is located in the A Concourse but very close to a clock that would minimize your walk. All areas and breakrooms have temperatures that are normally regulated under 86 degrees. Furthermore, none are assigned by a scheduler.

Please advise me immediately if you are in need of a further accommodation.

Sincerely,

Robert L. Yori
Human Resources Manager
610-362-1990



●●○○○ AT&T  LTE          12:32          ◀ ⚙ ✳ 88% ▭

<      Q  Colleen Koslosky      💬

 **Colleen Koslosky** is with **Peggy Farr** and **44 others.**   •••
January 17 · 👥

HOLY SH!T!

Look what I just found in my company email!

Two SPACE POSITIVE tickets, upgradable to First Class, anywhere in the world in recognition for being selected by Air Transport World's Airline o... See More

Tuesday, January 17, 2017                    American Airlines

## Special Jetwire
A Message from Doug Parker – Celebrating a Phenomenal 2016

Dear Team Members,

Today Air Transport World (ATW) – the leading magazine for global airlines and the air transport community – announced its selection of American Airlines as its 2017 Airline of the Year. American has won this prestigious award twice before, most recently almost 30 years ago in 1988. Congratulations!

This recognition is a testament to the mission shared by 120,000 team members of our mainline and wholly owned regional airlines. The ATW editorial board described the American integration as "practically flawless, despite it being the largest, most complex airline merger in history." And while it is satisfying to receive accolades for our integration work, it is even more energizing to receive recognition for the work being done for our future. ATW cited our operational and customer service improvements, as well as the more than $3 billion in new customer products and services, including greater onboard connectivity, new entertainment and dining choices, upgraded lounges and new destinations. Lastly, they note that all of this is being accomplished while delivering profitable returns to our shareholders.

American is setting a new standard for service, and that's thanks to the work all of you do. It is a noble calling to play a role in transporting the people who entrust their travel needs to us, and it is gratifying to be recognized when we do that well.

To celebrate this prestigious recognition by ATW and your unique part in it, American employees – including team members at Envoy, Piedmont and PSA – will receive two positive space, round-trip Main Cabin tickets anywhere we fly. These tickets will be upgradable to First Class on a space available basis, and will be available for use beginning this summer through December 2018. You can find more details on Jetnet.

American Airlines was selected as Airline of the Year for 2017 because of all of you and the jobs you do so well for our customers. I hope you enjoy a special trip, and the memories you'll create with someone close to you, as appreciation for all you've done to set American on its path to greatness. Congratulations and here's to another great year.

        



EXHIBIT
Koslosky-11
5/7/19 ALo
PENGAD 800-631-6989

AMERICAN 000418



38                                                                              2 Shares

👍 Like                    💬 Comment                    ➤ Share

**Colleen Koslosky**
Sep 23 at 09:12 · 🌐                                                        · · ·

If I were Black in America, I think I'd get down on my knees every day and thank my lucky stars that my ancestors were brought over here as slaves, because when you look at the amazing rights, privileges, and benefits that come along with U.S. citizenship, and then compare that to the relentless poverty, violence, and suffering in Africa, it's like winning the Super Lotto, a hundreds times over.

But I guess I'm old-fashioned that way, believing as I do in the importance of gratitude, humility, and respect.

– Dan Pflaum

EXHIBIT
Koslosky
12
5/7/19 ALo
PENGAD 800-631-6989

42                                                    21 Comments · 5 Shares

👍 Like                    💬 Comment                    ➤ Share



EXHIBIT
Koslosky
15
5/7/19 Alo



**Colleen Koslosky**

Sep 23 at 10:46am · 🌐                    · · ·

We are losing Blue Eyed People.

Too many are reproducing with Brown Eyed People.

This is true.

So Blue Eyed People...UNITE!



**All blue-eyed people have a single ancestor in common**
businessinsider.com

EXHIBIT
Koslosky
16
5/7/19 ALO
PENGAD 800-631-6989



September 27, 2017

Ms. Colleen Koslosky
110 Whitman Avenue
Stratford, NJ 08084

VIA EMAIL: colleenkoslosky@hotmail.com
Contact No: 856-904-3567

Dear Colleen:

As we discussed today by telephone, you are hereby held out of service with pay as we look into your allegations as well as other allegations regarding posts on social media.

As part of our inquiry, we will be scheduling a meeting with you in the near future. In accordance with your CBA, please arrange for union representation once that meeting is scheduled.

As a reminder, while you are held out of service, you are not allowed to use any of the flight privileges that are provided to you as an American Airlines employee, including traveling on any other carrier as a "non-revenue" pass traveler.

Joe Wilson, Manager on Duty

cc:     Beth Norton, MD, Customer Care, PHL
        Union Representative



AMERICAN 000412



October 6, 2017

To:     Colleen Koslosky, Emp. No. 467648
        Customer Service Agent

Re:     Termination of Employment

American Airlines recently became aware of several of your posts on your then-public Facebook page that contained concerning statements about race. One post stated, for example, "If I were Black in America, I think I'd get down on my knees every day and thank my lucky stars that my ancestors were brought over here as slaves." The post went on to imply that Black people who think otherwise lack "gratitude, humility, and respect." Another post, apparently in reference to recent protests by African-American athletes, was a photo of a T-shirt depicting a drawing of cotton with the statement, "Have you lost your cotton pickin' mind?" At the time that you posted this material, your social media presence identified you as an American Airlines employee and these posts were publicly available for anyone to view - including not only your co-workers, but also American Airlines customers.

In a meeting held to investigate this matter, you acknowledged that you posted this material on social media but you denied that there was any reason to apologize, saying, "I don't know why anyone would be upset." by this material.

As stated in our Social Media policy,

        Prior to posting anything online, remember you are personally responsible for the content you post or publish
        in any form of user-generated media. To the extent any of your personal or business related postings refer to,
        relate to, implicate or reflect on American Airlines or any other AAG company, you will be held responsible for
        complying with any American Airlines' rules, policies and procedures that may relate to your post.

The above-mentioned content that you posted on social media is wholly antithetical to the American Airlines Work Environment Policy, which among other things strictly prohibits bias-related behavior and verbal or visual conduct that denigrates or disparages others, including but not limited to any member of a minority, racial or ethnic group.

Moreover, I have concluded that your actions as described above violate the requirements reflected in the American Airlines Professional Conduct Standards for Passenger Service Employees, which state, in part:

        American Airlines team members are expected to demonstrate professional conduct that reflects
        commonsense, integrity, responsibility, initiative, efficiency and good judgment at all times. Team members
        should not act in a way that is detrimental to the welfare of, or reflects unfavorably on, the company or other
        team members.

As the Work Environment Policy makes clear, American Airlines does not tolerate bias-related behavior, and American Airlines embraces and celebrates diversity. Indeed, we state prominently on aa.com:

        From the team members we hire to the customers we serve, inclusion and diversity is a way of life at
        American Airlines. Every day, our team members work to make American a place where people of all
        generations, races, ethnicities, genders, sexual orientations, religious affiliations and backgrounds feel
        welcome and valued.

In light of your conduct, American Airlines is no longer able to trust you to engage with your co-workers and serve our customers in a way that demonstrates the Company's core values. Accordingly, and in view of the above, your employment is terminated effective with the issuance of this letter.

All Company property is to be returned to me and is not to be used for any purpose after the issuance of this letter. Please contact the Team Member Service Center at 800-447-2000 with any questions you may have regarding continuation coverage or other benefits.

*Beth M Norton*

Beth M. Norton
Managing Director – Customer Care
PHL

cc:     Personnel File
        CWA
        Human Resources

✓  Personally Handed to Employee
By: *Beth M Norton*

EXHIBIT
Koslosky
19
5/7/19 ALO

PENGAD 800-631-6989

**Communications**
**Workers of America**
AFL-CIO

230 South Broad Street, 19th Floor
Philadelphia, Pennsylvania 19102
(215) 546-5574 • Fax (215) 985-2102
Email: emooney@cwa-union.org

**Edward F. Mooney**
International Vice-President
District 2-13



June 27, 2018

Colleen Koslosky
110 Whitman Avenue
Stratford, NJ 08084

### Re: Grievance #GC09-09SEP/CWA Case #US C-PHL-13301-17-043
### Termination for Violation of AA Social Media Policy

Dear Ms. Koslosky:

On April 20, 2018 a letter was sent to you notifying you that CWA did not intend to advance the above referenced grievance to arbitration.

On May 14, 2018 your appeal letter was received in my office. Your appeal is timely and in proper order. However, for the reasons stated below I cannot agree to advance this dispute to arbitration.

Our records indicate that you were employed by American Airlines as a Customer Service Agent at the Philadelphia Airport with a hire date of December 12, 1983. On October 6, 2017 American Airlines (AA) terminated your employment for allegedly violating its Social Media and Work Environment policies.

Disciplinary action was taken, according to AA, after you notified supervision that your social media (Facebook) postings had been viewed by co-workers and were perceived as racially provocative and disparaging toward African-Americans. These postings were found on your publically-accessible Facebook account, visible to co-workers (some of whom were identified as Facebook "Friends") as well as AA customers.

American Airlines maintains a Social Media policy that prohibits "bias-related behavior and verbal or visual conduct that denigrates or disparages others, including…any member of a minority, racial or ethnic group." Further, AA maintains a Work Environment policy were employees are expected to "make American a place where people of all generations, races, ethnicities, genders, sexual orientations, religious affiliations and backgrounds feel welcome and valued."

Based on the publicly accessible Facebook postings that you acknowledged placing on your account, and defended by stating that you could not understand why anyone would be upset by them, an arbitrator would easily find that American had just

Koslosky

EXHIBIT
Koslosky
21
5/7/19 ALO
PENGAD 800-631-6989

000249

cause to take disciplinary action against you. The degree of discipline would be considered in light of the disruption in the workplace that your presence would accompany. Your actions not only violated various AA policies, they have also alienated and angered a large share of your co-workers. An arbitrator would be most reluctant to return you to the work place, in particular since you remain reticent to acknowledge the impact that your postings has on a large segment of American's workforce. For the above stated reasons, I cannot agree to advance this grievance to arbitration.

If you disagree with my decision, you may file an appeal under Section III of the Internal Appeals Procedure contained in the CWA Constitution. Your appeal must be in writing, signed by you, filed with the President of the Communications Workers of America, and submitted by mail, facsimile or personal delivery within thirty (30) days of the date of this letter (e-mails will not be processed). Your appeal must also contain any additional evidence the Union could use to persuade an arbitrator to sustain your grievance.

Please send your appeal to:

**Christopher Shelton, President**
**Communications Workers of America**
**501 Third Street, NW**
**Washington, DC 20001-2797**

Sincerely,

Edward F. Mooney,
International Vice President
Communications Workers of America

cc:     M. Davis
        P. Tronsor
        Case file

/arm

**CERTIFIED MAIL: 7017 3040 0001 1286 1368**