**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **COLLEEN KOSLOSKY,**<br><br>    *Plaintiff*,<br><br>    v.<br><br>**AMERICAN AIRLINES, INC.,**<br><br>    *Defendant*. | **Case No. 2:18-cv-04654-JDW** |

## MEMORANDUM

As social media has become ubiquitous, people must grapple with its pros and cons. It is an efficient, unfiltered way to reach a mass audience. It is an easy way to stay in touch with long-lost friends and professional contacts. It is a way to disseminate news and opinion to a broad audience. But posts often lack nuance. It does not allow for body language, facial expression, or tone of voice to affect a listener's understanding of the words used. Most posts are short and tend to be spur-of-the-moment, without benefit of editing.

Colleen Koslosky learned first-hand the danger of social media posts while working for American Airlines in 2017. Over a short period of time, she made several posts on her Facebook account containing inflammatory and racially insensitive sentiments that went viral. The posts created a firestorm. American's employees complained, as did some of its customers. So American fired her. In this lawsuit, she claims that American's decision to terminate her employment was discriminatory, either because it was a pretext for some discriminatory intent or because American was influenced by discriminatory subordinates. She does not have the evidence to support her claims, though. Instead, the evidence points to one conclusion: American fired her for her posts on social media.

**I.     FACTS**

   **A.     Ms. Koslosky's Employment With American**

For over 30 years, Ms. Koslosky worked as a customer service agent for American at the Philadelphia International Airport. Customer service agents work at the ticket counter, gates, internal recheck, Special Services, and the Passenger Operations Center ("POC"). All customer service agents are on the same pay scale and receive the same benefits, regardless of their role. American uses a seniority-based bidding process to determine which role a customer service agent will perform. Because Ms. Koslosky is among the most senior customer service agents, she can bid for—and hold—any customer service role. Ms. Koslosky chose to work as a gate agent. Gate agents receive daily assignments. And although an agent will usually only work one gate per shift, in cases of poor weather, mechanical delays, and diverted flights, a gate agent may need to be reassigned to another gate in a different terminal.

   **B.     Ms. Koslosky's Medical Issues**

Ms. Koslosky was diagnosed with melanoma and underwent two surgeries to remove it. Her second surgery, in September 2013, caused nerve damage and edema in her lower right leg, which limited her ability to walk. On August 15, 2016, Ms. Koslosky submitted a form requesting an accommodation that she be assigned only to gates in Terminal B because it is cooler and requires less walking.

American denied the request. It concluded that assigning Ms. Koslosky to gates in a single terminal would limit the company's ability to manage its operations and that the company could offer comparable positions to Ms. Koslosky. On August 22, 2016, American sent her a letter informing her of its decision and reminding her that she was free "to bid and hold a ticket counter" role. (ECF No. 28-3, Ex. 7.) There is some dispute among the parties about whether American's

Managing Director of Customer Care, Beth Norton, told Ms. Koslosky that American would grant Ms. Koslosky an accommodation around that same time, but the dispute is immaterial because American did not grant her an accommodation.

Even though American denied Ms. Koslosky's request, it suggested that she consider working a different customer service role, However, Ms. Koslosky refused to do so. Instead, on July 18, 2017, Ms. Koslosky submitted another request for accommodation. Her second request asked for the same accommodation—that she work only at gates in Terminal B. After Ms. Koslosky's second request for accommodation, Bob Yori, a Human Resources Manager, asked Ms. Koslosky to reconsider working one of the other customer service roles. He indicated that if Ms. Koslosky changed roles, American would provide any additional training she needed. On July 26, 2017, American denied Ms. Koslosky's second request to work only in Terminal B.

Ms. Koslosky again refused to work another service role. Instead, she immediately submitted the same request to Olympia Colasante, who was American's most senior executive in Philadelphia. Ms. Colasante granted the request "solely for the purpose of helping Colleen" and despite the potential disruption to operations. (ECF No. 28-5, 35:19-23.) Ms. Koslosky worked only in Terminal B for two months before American ended her employment.

   **C.**  **Ms. Koslosky's Facebook Posts**

Ms. Koslosky had a public Facebook account that included almost 100 of her coworkers as friends. On September 23, 2017, Koslosky posted two controversial messages on her Facebook account. One post contained a purported quote from Dan Phaum, which read:

> If I were Black in America, I think I'd get down on my knees every day and thank my lucky stars that my ancestors were brought over here as slaves, because when you look at the amazing rights, privileges, and benefits that come along with U.S. citizenship, and then compare that to the relentless poverty, violence, and suffering in Africa, it's like winning the Super Lotto a hundred times over. But I guess I'm

old-fashioned that way, believing as I do in the importance of gratitude, humility, and respect.

(ECF No. 28-3, Ex. 12.)

The second post, which linked to an article from "Businessinsider.com," stated, "[w]e are losing Blue Eyed People. Too many are reproducing with Brown Eyed People. It is true. Blue Eyed People . . .UNITE!" (ECF No. 28-3, Ex. 16.) Ms. Koslosky also posted an image of a t-shirt with the words, "Have you Lost Your Cotton Pickin' Mind?" written on it. (ECF No. 28-3, Ex. 15.)

Ms. Koslosky's posts went viral. At least one person posted them on American's official Facebook and Twitter pages, and many people identified Ms. Koslosky as an American employee. Ms. Koslosky heard from an American employee in Ft. Lauderdale that customers and employees as far away as Seattle were discussing her posts. Employees both in Philadelphia and elsewhere complained to the company through various channels, including to the company's CEO. American passengers also complained. In her deposition, Ms. Colasante stated that Ms. Koslosky's posts generated "significant turmoil" with a "lineup at her door constantly." (ECF No. 28-5, 62:5-62:10.) Some employees reported that they were not comfortable working with Ms. Koslosky.

To address the fallout from the posts, Ms. Colasante had to send an e-mail to all Philadelphia-based employees reaffirming the company's commitment to diversity and inclusion. On September 27, 2017, American suspended Ms. Koslosky with pay, pending an investigation. On September 29, Ms. Koslosky met with American's duty managers Jenny O'Neill and Nicole Blanchard. During the meeting, Ms. Koslosky acknowledged that she posted the content but maintained that her intent was not racist. She also claimed that the posts were taken out of context and were in reference to the NFL. However, Ms. Colasante determined that Ms. Koslosky had posted comments that employees, customers, and the company perceived to be racist in nature. Ms. Colasante therefore concluded that the posts violated American's social media, passenger

4

service conduct, and work environment policies. On October 6, 2017, American terminated Ms. Koslosky's employment. In the termination letter, American indicated that it was "no longer able to trust [Ms. Koslosky] to engage with [her] co-workers and serve [the company's] customers in a way that demonstrates the Company's core values." (ECF No. 28-3; Ex. 19.)

### D. Tom Doersam

Ms. Koslowski identifies Tom Doersam as a comparator employee. Mr. Doersam was an American customer service supervisor who posted inflammatory social media comments to Facebook, but his comments tended to be critical of President Trump and his supporters. These comments included "[g]et rid of ignorant rednecks," and "Trump supporter [equals] Nazi sympathizer [equals] stay away from me." (ECF No. 31-3, Ex. I.) Although Mr. Doersam had a Facebook account that identified himself as an American employee, no one complained to the company about his comments. American never disciplined Doersam for violating its policies.

### E. Administrative And Procedural History

On February 14, 2018, Ms. Koslosky dual-filed an administrative charge with the EEOC and PHRC, alleging gender and disability discrimination, failure to accommodate, and retaliation. On October 29, 2018, Ms. Koslosky filed this action, asserting claims for gender discrimination in violation of Title VII and the PHRA (Counts I and II), disability discrimination under the ADA and the PHRA (Counts III and IV), and retaliation under the ADA and the PHRA (Counts V and VI). However, during her deposition, Ms. Koslosky testified that American did not terminate her because of her disability or in retaliation for her accommodation requests. Nevertheless, she refused to withdraw these claims. After discovery, American moved for summary judgment on each of Ms. Koslosky's claims. The Motion is now ripe for disposition.

## II.     LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) permits a party to seek, and a court to enter, summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he plain language of Rule 56[(a)] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quotations omitted). In ruling on a summary judgment motion, a court must "view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion.'" *Scott v. Harris*, 550 U.S. 372, 378 (2007) (quotation omitted). However, "[t]he non-moving party may not merely deny the allegations in the moving party's pleadings; instead he must show where in the record there exists a genuine dispute over a material fact." *Doe v. Abington Friends Sch.*, 480 F.3d 252, 256 (3d Cir. 2007) (citation omitted). The movant is entitled to judgment as a matter of law when the non-moving party fails to make such a showing. *See Celotex*, 477 U.S. at 323.

## III.    ANALYSIS

### A.      Timeliness

Before filing suit in federal court under the ADA, a plaintiff must exhaust her administrative remedies by filing a timely administrative charge, though that requirement is not jurisdictional. *See Ruehl v. Viacom, Inc.,* 500 F.3d 375, 383 (3d Cir. 2007); *Fort Bend Cty., TX v. Davis*, 139 S.Ct. 1843, 1846 (2019). A plaintiff must file a charge of discrimination with the EEOC within 300 days of the alleged unlawful employment practice before filing a complaint in court. *See* 42 U.S.C. § 2000e-5(e)(1), (f)(1). A plaintiff must file with the PHRA within 180 days of the

alleged discrimination. *See* 43 Pa.C.S. § 959(h); *Burgh v. Borough Council of Montrose*, 251 F.3d 465, 471 (3d Cir. 2001).

Ms. Koslosky did not file a timely administrative complaint about American's alleged failure to accommodate her. She first submitted a request for accommodation on August 15, 2016. American denied her request on August 22, 2016. Ms. Koslosky filed her disability claim with the EEOC on February 14, 2018—more than 500 days after American denied her request for accommodation. The claim is therefore not timely.

Ms. Koslosky cannot rely on the second request for an accommodation that she submitted in July 2017 to avoid that result. The second accommodation request cited the same disability and asked for the same accommodation. It was nothing more than a second bite at the apple. "Mere requests to reconsider [an employer's decision] ... cannot extend the limitations periods applicable to the civil rights laws." *Delaware State College v. Ricks*, 449 U.S. 250, 261 n. 15 (1980). "[I]f an employee could render a claim timely by simply renewing a previously denied request, the limitations period would be rendered meaningless." *Mercer v. Se. Pa. Transit Auth.*, 26 F. Supp.3d 432, 442 (E.D. Pa. 2014), *aff'd sub nom. Mercer v. SEPTA*, 608 F. App'x 60 (3d Cir. 2015). Therefore, the Court concludes that Ms. Koslosky's failure-to-accommodate claims are untimely.

### B. Claim Abandonment

American argues that Ms. Koslosky abandoned her claims that American discriminated against her based on her disability or that American retaliated against her when it terminated her. The Court disagrees. Nothing in the Federal Rules of Civil Procedure provides for the abandonment of an individual legal claim through deposition testimony. Instead, "withdrawals of individual claims against a given defendant are governed by [Fed. R. Civ. P.] 15, which addresses amendments to pleadings." *Hells Canyon Pres. Council v. U.S. Forest Serv.*, 403 F.3d 683, 687

(9th Cir. 2005) (citation omitted); *see also* 8 James Wm. Moore, et al., Moore's Federal Practice § 41.21[2] (4th ed.2006) ("[a] plaintiff wishing to eliminate particular claims or issues from the action should amend the complaint under Rule 15(a) rather than dismiss under Rule 41(a)").

Here, Ms. Koslosky did not testify during her deposition that American did not discriminate against her. She testified about her understanding of the claims she is asserting in the case. There is an important difference between those two. While a plaintiff alleging discrimination should know if discrimination occurred, she might not understand the nuance of the claims that she asserts as a result. A mistake as to the latter at a deposition should not be binding on her. Ms. Koslosky's testimony is therefore unlike the testimony in the cases that American cites and that led other courts to grant summary judgment when a plaintiff testified that there was no discrimination.

### C.  Merits of Remaining Claims

Ms. Koslosky advances two different theories of liability for her remaining claims, all of which focus on her termination. She asserts a pretext theory of liability for all of her claims and a cat's paw theory for her gender discrimination claim. The Court addresses those distinct theories in turn.

#### 1.  Pretext theory of liability

Under a pretext theory of liability, the Court applies the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Under that familiar framework, Ms. Koslosky must demonstrate a prima facie case of discrimination. Then, she must adduce evidence that American's legitimate, non-discriminatory basis for her termination—her Facebook posts—is a pretext.

### a. Prima facie case

For each of her claims, Ms. Koslosky will have to prove causation, among other things. *See Jones v. Se. Pa. Transp. Auth.*, 796 F.3d 323, 327 (3d Cir. 2015) (*prima facie* case of gender discrimination requires showing of "some causal nexus" between genera and adverse treatment); *Shaner v. Synthes*, 204 F.3d 494, 500 (3d Cir. 2000) (ADA disability discrimination); *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 193 (3d Cir. 2015) (retaliation). Ms. Koslosky cannot prove causation for any of her claims and therefore cannot establish a prima facie case.

### i. Gender

Ms. Koslosky bases her gender discrimination claim on American's treatment of Mr. Doersam, who she points to as a comparator. "The identification of a similarly-situated individual outside of the protected class who engaged in the same conduct as plaintiff but was treated more favorably may give rise to an inference of unlawful discrimination." *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 170 (3d Cir. 2013). To be proper comparators, these other employees must have been "similarly[ ] situated in all respects." *In re Tribune Media Co.*, 902 F.3d 384, 403 (3d Cir. 2018) (quote omitted). Employees are similarly situated in all respects when they held the same job or responsibilities, shared the same supervisor or had the same decision-maker involved in a decision about their employment, have comparable violation histories, and engaged in "nearly identical" conduct. *Doe v. Apria Healthcare Group, Inc.*, 97 F. Supp.3d 638, 645 (E.D. Pa. 2015) (quoting *Lee v. Kansas City S. Ry. Co.*, 574 F.3d 253, 259-61 (5th Cir. 2009)).

The Court rejects Ms.Koslosky's proposed comparator evidence. Mr. Doersam and Ms. Koslosky were not similarly situated. Both worked in customer service, but they did not hold the same position. Both made inflammatory Facebook posts with potentially offensive language. But Mr. Doersam's posts were political in nature, even though they used charged verbiage. Ms.

9

Koslosky's posts, on the other hand, made comments that an objective reader would view as racist because they discussed people's personal characteristics and membership in protected classes. Although both had the potential to cause upset, they were not the same. Most importantly, Ms. Koslosky offers no evidence that anyone ever reported Mr. Doersam's posts to American. Therefore, American could not have treated the two differently because, without knowing about his posts, it had no basis to take any action against Mr. Doersam. *See Simpson v. Kay Jewelers*, 142 F.3d 639, 646 (3d Cir. 1998) ("focus is on the particular criteria or qualifications identified by the employer as the reason for the adverse action"). American does not have to monitor all of its employees' social media feeds just to make sure it treats everyone the same. Instead, it just has to make sure that it responds similarly when information about employees' social media accounts comes to its attention. Ms. Koslosky has no evidence that it failed that obligation here.

### ii. Disability

Ms. Koslosky does not cite to any evidence to support a causal connection between her disability and her termination. American initially rejected her request for an accommodation, but Ms. Colasante reversed course and agreed to it approximately two months before her termination. American then accommodated Ms. Koslosky until her Facebook posts created a firestorm. Ms. Koslosky points to American's initial denial of her accommodation requests and argues that its "repeated denial was indicative of discrimination." (ECF No. 31 at 13.) Even if she were right, it sheds no light on the decision to terminate her. When that decision was made, the questions about her accommodation had passed. She therefore cannot make out a prima facie case of disability discrimination.

### iii. Retaliation

Ms. Koslosky has no evidence to suggest that American terminated her in retaliation for requesting an accommodation. More than two months passed between the time that Ms. Colasante agreed to Ms. Koslosky's requested accommodation and American's decision to terminate her. Temporal proximity is only unduly suggestive of discrimination after considering all of the facts and circumstances. *See Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 279-80 (3d Cir. 2000). At times, the Third Circuit has found that two months is not unduly suggestive, nor is three weeks. *See Williams v. Phila. Housing Auth. Police Dep.*, 380 F.3d 751, 760 (3d Cir. 2004); *Thomas v. Town of Hammonton*, 351 F.3d 108, 114 (3d Cir. 2003). Here, during the two months, Ms. Koslosky worked pursuant to an accommodation that she received from American's senior-most employee in Philadelphia. She does not identify anything that happened during those two months to suggest anyone was resentful about her accommodation. Nor does she explain why employees who worked for Ms. Colasante would retaliate against Ms. Koslosky for Ms. Colasante's decision. Even when the Court views the facts as a whole, as Ms. Koslosky urges the Court to do, they do not suggest any causal link between her protected activity and her termination.

### b. Pretext

Even if Ms. Koslosky could prove a prima facie case, she cannot prove pretext. To prove that American's reason for her termination was pretext, Ms. Koslosky must offer evidence to permit a juror either to disbelieve American's reason for her termination or "believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994) (cleaned up); *see also Fasold v. Justice*, 409 F.3d 178, 185 (3d Cir. 2005). To do that, she must "demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [American's]

11

proffered legitimate reasons for its action that a reasonable factfinder *could* find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Fuentes*, 32 F.3d at 766.

Plaintiff points to two pieces of evidence to establish pretext: (1) American's disparate treatment of Mr. Doersam; and (2) the scope of American's investigation before terminating her. Neither establishes pretext. First, it bears repeating that Ms. Koslosky has no evidence that American knew about Mr. Doersam's social media posts. It therefore had no occasion to decide whether and how to apply its policies to Mr. Doersam.

As to the investigation, Ms. O'Neill and Ms. Blanchard met with Ms. Koslosky, and Ms. Koslosky admitted that she posted the posts in question. Ms. Koslosky complains about the way that American conducted the investigation because she says that American ignored other posts that she had made that were "more favorable to African-Americans and minorities" and that American "rejected [her] explanation regarding here posts, which provided the context of her posts and demonstrated that she lacked ill intent." (ECF No. 31 at 8.) But American was not obligated to accept Ms. Koslosky's explanation for her posts, it did not have to conduct a holistic analysis of her social media feed, it did not have to determine whether other posts in her feed might mitigate the offending posts, and it did not have to decide what type of person Ms. Koslosky is or was. An objective reader would see the posts as racist on their face, as many people apparently did. American did not have to look for reasons to discount that. It was enough that American determined that Ms. Koslosky posted the material and set off the ensuing firestorm.

To the extent that Ms. Koslosky's complaint is that American's investigation should have excused her posts because her account did not identify her as an American employee, that argument also fails. Regardless of whether her account identified her as an American employee, there is no

12

dispute that people later identified her as an employee when her posts went viral and that those posts had an impact on American's operations. American could consider that, and its decision to do so did not evidence pretext.

### 2. Cat's paw theory of liability

Under a cat's paw theory of liability, a plaintiff seeks to hold her employer liable for the animus of a subordinate, non-decisionmaker. *See McKenna v. City of Phila.*, 649 F.3d 171, 177-78 (3d Cir. 2011). To prove a cat's paw theory, a plaintiff must prove that the conduct was a proximate cause of the termination, meaning "some direct relation between the injury asserted and the injurious conduct alleged," as opposed to links that are "remote, purely contingent, or indirect." *Jones v. Se. Pa. Transp. Auth.*, 796 F.3d 323, 330-31 (3d Cir. 2015).

Ms. Koslosky has shown that many people, including American employees, made offensive, gender-based comments in response to Ms. Koslosky's posts. But those were only a few complaints among many. The Court will not assume that just because a few employees who reported Koslosky may have been biased, all employees who complained harbored similar sentiments. Nor has Ms. Koslosky shown that the complaints from potentially biased employees played any particular role in American's decision to terminate Ms. Koslosky. Instead, American heard plenty of complaints from individuals who had no apparent bias, and American's decision was based on the overall firestorm. The Court therefore concludes that Ms. Koslosky cannot prove the causation element of a cat's paw theory of gender discrimination.

## IV. CONCLUSION

Ms. Koslosky created a firestorm with her racist posts, which employees and customers reported to American. American made the legitimate, non-discriminatory decision to terminate her in order to quell the controversy she created. There is no evidence that American's decision was

motivated by any sort of discrimination. The Court will therefore grant American's motion for summary judgment. An appropriate Order follows.

**BY THE COURT:**

*/s/ Joshua D. Wolson*
JOSHUA D. WOLSON, J.

Dated:  April 27, 2020